573 A.2d 70

**George Bennett STEFFEY, Jr.**

v.

**STATE of Maryland.**

**No. 1226, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 7, 1990.

William C. Brennan, Jr. (Knight, Manzi, Brennan, Ostrom & Ham, P.A., on the brief), Upper Marlboro, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before GARRITY, ALPERT and KARWACKI, JJ.

ALPERT, Judge.

The central question in this appeal is whether a violation of a police officer's immunity under § 728(b)(7)(ii) of the Law Enforcement Officers' Bill of Rights (LEOBOR), Md. Ann.Code art. 27, §§ 727–734D, warrants dismissal of an indictment against that officer. A Prince George's County grand jury indicted the appellant, George B. Steffey, on six counts, including misconduct in office. Appellant moved to dismiss the indictments. At a pre-trial motions hearing, Judge Robert J. Woods denied appellant's motion. Appellant then was tried before a jury, which found him guilty on the misconduct count. He appeals from that conviction.

Appellant was an officer with the Prince George's County Police Department working the night shift at the time of the subject incident in September 1988. The following statement of facts is based upon his unrefuted testimony concerning the incident. On the night before the incident, while assisting another officer in a routine arrest following a traffic stop, appellant found a BB handgun in the arrestee's car. He placed the gun in the back of his police cruiser so he could inventory the gun when he returned to the station at the end of his shift. Appellant did not perform the inventory, however, because he did not see the officer he had assisted in the arrest and therefore could not get the case number from him.

While working a second job as a security guard later that day (following the night shift), appellant purchased a $CO_2$ cartridge and a package of BBs from a hardware store at Eastover Shopping Center where he worked. At one point, he went behind the shopping center and fired the BB gun several times, discovering that it only fired about every fourth time because of a malfunctioning spring.

That night, appellant and Corporal Clarence Voundy were specially assigned to patrol certain open-air "drug markets." On the way to one of the drug areas in two separate cruisers, the officers stopped behind an elementary school to allow appellant to put on his blue jumpsuit uniform over

his standard uniform. While appellant was putting his uniform on, Voundy noticed the BB gun in the back of appellant's car. After asking appellant if he could see the gun, Voundy took it out and began shooting at nearby signs.

Appellant and Voundy then proceeded to the assigned drug area. As they exited their vehicles, Voundy again asked appellant for the BB gun. Appellant handed the gun and the remaining pellets to Voundy, who outranked appellant. The officers took a concealed route toward the drug market, hoping to surprise the alleged dealers who were standing around possibly engaging in drug transactions. Before appellant and Voundy "could implement their plan of attack," someone else fired a gunshot and the crowd dispersed.

Moments later, the officers came upon three individuals whom they believed had run from the drug area. Appellant and Voundy identified themselves as police officers and told the three suspects to lie on the ground. Appellant took control of two of the suspects, Calvin Proctor and another, unidentified man. Voundy handled the third suspect, Rodney L. Simms. Appellant had conducted a search of his two suspects and was beginning to question Proctor about drugs he had found on the ground near Proctor when he heard Simms yell, "Ouch! Ouch! That hurt." Appellant then looked over and saw Voundy standing over Simms, pointing the BB gun at him. Appellant noticed blood running down the side of Simms's face. Appellant testified that:

> I didn't know what to do. I took and told Mr. Proctor to get on the ground. Clarence started hollering. "There's nothing coming out of the damn gun." He was taking the gun and he was doing this (indicating) with his hand with the gun.
>
> I walked over to Clarence and I placed my left hand on Corporal Voundy's left shoulder and I said, "What did you do that for?"

Corporal Voundy started laughing and said, "Steffey, they're drug dealers. They're never going to say nothing."

Within hours after the incident, Simms filed a complaint with the Prince George's County Police Department, alleging the use of unnecessary and excessive force in effecting an arrest. According to Simms's version of the incident, he and Proctor were on their way to pick up a friend when they were stopped by two officers, one black and one white. (Voundy is black; appellant is white.) When Simms denied having any drugs, the black officer took out a gun and began firing at the back of his head. Simms felt only air coming out of the gun until the black officer yelled, "It's nuthin' in this damn gun. It's nuthin' in this damn gun." The white officer then went over to the black officer and Simms heard what sounded like a pinging sound against metal. Moments later, the black officer fired two more times at the back of Simms's head, striking him with BBs both times. The black officer then lifted up Simms's jacket and shirt and shot him in the back six times. After the attack, Simms and Proctor were ordered to run away from the scene.

At the trial Simms admitted that he never saw the white officer pass any BB pellets to the black officer. He alleged, however, that he had heard the white officer say to the black officer, "I have something for you to put in this gun." Simms admitted during cross-examination that his written statement to the police on the night of the incident made no mention of the white officer saying anything to the black officer.

Appellant was called into the police department's Internal Affairs Section (IAS) a few hours after the incident. Pursuant to the LEOBOR, Lieutenant Phillip Constantino informed appellant (1) that he was under investigation in connection with the incident, (2) that he was being ordered to write a "duress statement" concerning the incident, and (3) that he had the right to postpone making the duress statement for ten days in order to obtain an attorney.

Appellant exercised his right to wait until he found an attorney.

That night appellant was again called into IAS. During this period, appellant was not free to leave the police station. Constantino served appellant with a document notifying him of the administrative charges against him. According to Constantino's testimony at the motions hearing, while he was serving appellant with the document, appellant said, "That is not me. I was there. I didn't do this." Constantino testified that he then advised appellant that he should have an attorney present. Because Constantino felt "uncomfortable" listening to what he termed appellant's "utterances," he called his commanding officer, Captain McDonald, into the room. According to Constantino, McDonald then asked appellant where he got the BBs. The trial judge and Constantino then held the following discussion:

THE COURT: So, who asked that question?

THE WITNESS: The Captain did, sir.

THE COURT: He asked him that question?

THE WITNESS: And then it was realized that we were probably wrong in asking that and everything stopped. He was told he should have his attorney.

THE COURT: Did he answer the question?

THE WITNESS: Yes, sir.

THE COURT: And what did he say?

THE WITNESS: He got it on Nova Avenue from a drug arrest made by Officer Qualls, that the drug [sic] had been in the vehicle that—

THE COURT: What else did he say as a response to that as to the BB's and—

THE WITNESS: Again, that was the second time. He had already told me about where he had gotten the BB's, and he reiterated that statement in front of Captain McDonald.

THE COURT: And what did he say to Captain McDonald?

THE WITNESS: That he was there, he got the BB's and the $CO_2$ at Eastover Shopping Center.

THE COURT: Did he tell you that he had gotten the BB's at Eastover Shopping Center, or did he just tell you—I'm looking now at page 13 of the Grand Jury testimony—that he had bought the BB's, you had said to the Grand Jury that he said, yeah, I was there and I bought the BB's?

THE WITNESS: That was originally what he had said to me. The second time the word "Eastover Shopping Center" did come out.

. . . .

MS. GWINN [for the State]: I'm not sure what he's referring to as the second time.

THE WITNESS: When he reiterated to Captain McDonald—

THE COURT: That's when he said they were bought at Eastover.

Appellant eventually submitted a written duress statement, apparently after he had made the "utterances" to Constantino.

Appellant and Voundy were indicted by a Prince George's County grand jury and charged in a six-count indictment with two counts of assault, one count of assault and battery, false imprisonment, carrying a dangerous weapon openly with the intent to injure, and misconduct in office. The court severed the cases for trial.

Appellant was tried before a jury, with Judge Woods presiding. The jury found him not guilty of the first five counts but guilty of the sixth count, misconduct in office. Judge Woods sentenced appellant to 30 days' incarceration. Appellant filed a timely appeal and presents to this court three arguments which we shall set forth in order.

I. The Court erred by not granting Steffey's Motion to Dismiss the Indictment based on the ground that the State violated his right, created by statute in the Law

Enforcement Officers Bill of Rights, that compelled testimony not be used in a criminal proceeding.

Maryland Ann.Code art. 27, § 728(b)(7)(ii), part of the LEOBOR, provides in pertinent part that:

The results of any ... interrogation, as may be required by the law enforcement agency under this subparagraph are not admissible or discoverable in any criminal proceedings against the law enforcement officer when the law enforcement officer has been ordered to submit thereto.

While testifying before the grand jury, Lieutenant Constantino discussed what occurred immediately after he served the administrative charges on appellant. According to Constantino,

[Appellant] became distraught, and he looked at me, said, "Why are you doing this? Are you doing this because I didn't make a statement?"

At that time I told him, "No. Because the evidence is there, and you didn't notify your sergeant of the incident."

That's when he stated to me, "I didn't do this. This is not me." He said, "Yeah, I was there, and I bought the BBs." He said, "I bought the $CO_2$, but I did not do the shooting."

It was then I told him, "You have already asked for an attorney. You are violating your own rights."

Feeling uncomfortable myself that he was now this distraught and making these statements, I went and asked Captain McDonald, who is my immediate supervisor, to come into the room. That's when he also made utterance that, yes, he had gotten the BB gun from another officer.

Okay. Again I told him, "You have to make none of these statements. You have already asked for an attorney."

When asked by a grand juror whether appellant had admitted to buying the pellets and $CO_2$, Constantino replied,

"That's right. At that time he had said that he had bought the BBs and $CO_2$ at Eastover...."

Appellant filed a number of pre-trial motions, including a motion to suppress and a motion to dismiss the indictment. During the motions hearing before Judge Woods, appellant moved to supplement his motion to dismiss the indictment on the grounds that Lieutenant Constantino revealed some of appellant's compelled statements to the grand jury and that this revelation violated appellant's statutory rights under § 728(b)(7)(ii). Defense counsel argued (1) that Constantino could only have known where appellant bought the BBs and $CO_2$ from the written duress statement, and (2) that all of the statements appellant made to Constantino were made under duress. Appellant's attorney admitted, however, that appellant also had made statements about the incident to officers other than Lieutenant Constantino.

Judge Woods denied appellant's motion to dismiss the indictment, saying,

[C]learly the lieutenant did add the words "at Eastover", and Officer Steffey was under duress when those words were added to the Grand Jury and he was under duress when the entire proceedings started in the police station.

I'm not going to dismiss the indictment, and the reason I'm not going to do it is ... the Court finds that Officer Steffey not only to Lieutenant Constantino, but with other officers had the habit—habit because he was distraught because of what was occurring and apparently wanted to explain himself, made a lot of gratuitous statements. In fact, they got so gratuitous in this case that the lieutenant became uneasy and went out to get Captain McDonald.

Captain McDonald came back and asked a question that should not have been asked, and as to that statement and as to anything else that was said as a result of that, of course, I would suppress it, but I will not dismiss the indictment. I do not think it reaches that stage.

■ We note first that, according to Lieutenant Constantino's unrefuted testimony at the motions hearing, appellant told him without being prompted that he was there when Corporal Voundy shot Simms with the BB gun, and that he had bought the BBs (and, presumably the $CO_2$ cartridge).[1] These admissions clearly were "blurts," *see Ciriago v. State,* 57 Md.App. 563, 573–76, 471 A.2d 320, *cert. denied,* 300 Md. 152, 476 A.2d 721 (1984), rather than compelled testimony. Thus, their admission before the grand jury did not constitute a violation of § 728(b)(7)(ii).

The only portion of Lieutenant Constantino's grand jury testimony, therefore, that conceivably could have violated § 728(b)(7)(ii) was his statement that appellant admitted to buying the BBs and $CO_2$ "at Eastover." Constantino testified at the motions hearing that he had never seen the written duress statement, and appellant offered no evidence to the contrary. Thus, appellant's argument that the lieutenant obtained the information about Eastover from the written statement was without merit. As the State admits on appeal, however, appellant only mentioned where he bought the BBs and $CO_2$ in response to Captain McDonald's ill-advised, one-question interrogation. The admission about Eastover Shopping Center, therefore, did constitute compelled testimony.

■ Appellant acknowledges that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974) (citations omitted). *See also Lawn v. United States,* 355 U.S. 339, 348–49, 78 S.Ct. 311, 317–18, 2 L.Ed.2d 321, *reh'g denied,* 355 U.S. 967, 78 S.Ct. 529, 2 L.Ed.2d 532 (1958) (petitioners, whose indictments by one grand jury

---

1. The parties appear to agree that the BBs and the $CO_2$ were purchased at the same time.

were dismissed because petitioners testified and were not warned of Fifth Amendment right against self-incrimination, could not challenge indictments by a later grand jury on grounds that second grand jury might have considered self-incriminating evidence that petitioners revealed to first grand jury); *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397, *reh'g denied*, 351 U.S. 904, 76 S.Ct. 692, 100 L.Ed. 1440 (1956) (indictment will not be dismissed even if only evidence presented to grand jury was hearsay evidence); *Holt v. United States*, 218 U.S. 245, 247–48, 31 S.Ct. 2, 4, 54 L.Ed. 1021 (1910) ("The abuses of criminal practice would be enhanced if indictments could be upset" on the ground that the grand jury based its indictments on incompetent evidence.).   Appellant cites a Tenth Circuit case, *United States v. Beery*, 678 F.2d 856 (10th Cir.1982), however, for the proposition that the *Calandra* analysis does not preclude dismissal of an indictment where the prosecutor's presentation of evidence before the grand jury violated a separate statutorily created privilege of the defendant, such as the § 728(b)(7)(ii) privilege against the admission of compelled statements.

Appellant's analysis of *Beery* is a correct one.   We disagree, however, with the *Beery* court's interpretation of *Calandra*.   Because the holding in *Beery* rests on that interpretation, we decline to follow the Tenth Circuit's decision.   We explain.   Immediately after paraphrasing the above quote from *Calandra*, the *Beery* court wrote,

> The Supreme Court, however, has recognized that there may be a different result where what was transpiring before the grand jury would itself violate a constitutional or statutory privilege. *See United States v. Calandra*, 414 U.S. at 346, 94 S.Ct. at 619.

*Beery*, 678 F.2d at 860 (citation in original).   The portion of *Calandra* that *Beery* cites, however, pertains only to the actions of grand juries themselves.   The Supreme Court stated, for example, that:   the grand jury "may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes,

or the common law"; "the grand jury may not force a witness to answer questions in violation of [the Fifth Amendment]"; "a grand jury may not compel a person to produce books and papers that would incriminate him"; and "[t]he grand jury is also without power to invade a legitimate privacy interest protected by the Fourth Amendment." *Calandra,* 414 U.S. at 346, 94 S.Ct. at 619. The *Beery* court incorrectly applied this discussion as support for its holding that an indictment must be dismissed if a defendant's testimony that has been immunized by statute *is used* during grand jury proceedings, unless the error is held harmless, beyond a reasonable doubt. *Beery,* 678 F.2d at 860. *Calandra* did not hold that courts must dismiss indictments based upon the evidence *presented* to grand juries and thus *used* during grand jury proceedings. Rather, *Calandra* simply pointed out which actions by grand juries themselves would not be tolerated.

■ In *Gelbard v. United States,* 408 U.S. 41, 60, 92 S.Ct. 2357, 2367, 33 L.Ed.2d 179 (1972), the Supreme Court stated that "a defendant is not entitled to have his indictment dismissed before trial simply because the Government 'acquire[d] incriminating evidence in violation of the [law],' even if the 'tainted evidence was presented to the grand jury.'" Quoting *Gelbard* in *Hopkins v. State,* 19 Md.App. 414, 426, 311 A.2d 483 (1973), *cert. denied,* 271 Md. 738 (1974), we added,

> The grand jury is an inquisitional and accusatory body. It does not determine the guilt or innocence of the accused as that decision is vested in the petit jury or court, if there be a non-jury trial. That an indictment is founded on tainted evidence is no grounds for dismissal.... The rules of evidence are not applicable to grand jury proceedings.

*See also United States v. Lawson,* 502 F.Supp. 158, 168 (D.Md.1980) ("[T]he grand jury is permitted to consider any evidence bearing upon a defendant's factual guilt, regardless of whether it would be excluded at trial to protect a constitutional right or to deter government misconduct.");

*In re: A Special Investigation No. 228,* 54 Md.App. 149, 183, 458 A.2d 820, *cert. denied,* 296 Md. 414 (1983) ("Even to vindicate the loftiest of constitutional ideals, we do not suppress evidence at the grand jury level."); *Bartram v. State,* 33 Md.App. 115, 182, 364 A.2d 1119 (1976), *aff'd,* 280 Md. 616, 374 A.2d 1144 (1977) ("[I]t is not within the power of this Court, or of courts generally, to interfere with the decision-making process of the grand jury or to inquire into the sources of, or sufficiency of, the knowledge upon which they base their decisions."); 1 J. Wigmore, *Evidence* § 4, at 70 (P. Tillers rev. 1983) ("Federal constitutional law ... does not make an indictment void or mandate its dismissal merely because the indictment rests in part on evidence presented to the grand jury in violation of a constitutional privilege.").

Based upon these authorities, we hold that appellant was not entitled to a dismissal of his indictment, even though a portion of Lieutenant Constantino's statement to the grand jury, concerning where appellant bought the BBs and the $CO_2$, was tainted evidence. Finally, an exhaustive search of the legislative history of § 728(b)(7)(ii) revealed nothing to indicate that a court must dismiss an indictment against a police officer simply because the grand jury heard testimony based on statements the officer was compelled to make under the LEOBOR.

II. The Court erred by refusing to instruct the jury properly on Count Six where the jury was instructed as to malfeasance, misfeasance and nonfeasance as the alleged misconduct in office where the count only alleged malfeasance.

■ While instructing the petit jury concerning Count Six, misconduct in office, Judge Woods said,

Misconduct in office takes one of three forms, malfeasance, misfeasance and nonfeasance. Malfeasance, misfeasance and nonfeasance. Although the three terms are sometimes used interchangeably, they do not mean the same thing. The name by which the crime is called does

not control, but the facts alleged do control. The facts alleged and the facts proven.

Malfeasance means this. Malfeasance means that a person in office has performed an act that he ought not to have performed. The root of the offense is the corrupt nature of the act and not the motive of the officeholder.

Misfeasance is the performing of a lawful act in an unlawful manner.

And nonfeasance is the failure by the public officer or official to do what he ought to have done.

Defense counsel then excepted to a number of Judge Woods's instructions. Regarding the misconduct instructions, the following colloquy ensued:

MR. BRENNAN: The other thing, in this misconduct charge, Your Honor, there's also a to wit, and it says—basically it's the last paragraph on that page, Your Honor. And again, it doesn't say anything about not reporting it. It basically focuses in on the assault and battery of Mr. Simms and Mr. Proctor.

THE COURT: .... So, you want me to say that because you don't want to get into the fact that he didn't tell about Voundy?

MR. BRENNAN: Right, since the indictment says—more particularly and specifically says what it is as to the alleged misconduct, I think the jury should be instructed on that.

....

THE COURT: .... Okay.

MR. BRENNAN: And there's the other thing. I think I did say this before. I don't like the jury picking between nonfeasance, misfeasance and malfeasance.

THE COURT: All right.

MR. BRENNAN: I think the State should be more specifically and the State should elect which one they're going under.

THE COURT: All right.

The judge then gave additional instructions, including the following amended instruction concerning the misconduct charge:

Going back and looking at the last charge, which is misconduct in office, when George Bennett Steffey was charged, let me read you the charge, which I think will clear up any misunderstanding as to what misconduct the State must prove.

That George Bennett Steffey, Jr., well and knowing the premises, in wilful disregard of his oath, corruption to his public office and in violation of the lawful conduct of his duty, more particularly while acting under the color of his office, and this is what they said he did that constitutes misconduct, did forcibly and illegally apprehend and detain Rodney Lamont Simms and Calvin Proctor and did then make an assault and did beat, batter and wound and ill-treat said Rodney Lamont Simms and Calvin Proctor.

That is what the misconduct in office applies to, the illegal—what they allege and must prove is the illegal apprehension and the beating, battering and wounding or ill-treating Rodney Simms and Lamont—and Calvin Proctor.

Defense counsel did not object to the amended instructions. He said, "With the exception of the other matters we discussed at the bench [which did not involve the misconduct charge], we are satisfied, Your Honor."

Appellant appears to contend on appeal that defense counsel did object to the amended instruction when he argued (before the amended instruction was given) that the State should elect whether the jury was being asked to find malfeasance, misfeasance or nonfeasance. As we noted above, defense counsel said at that time, "I don't like the jury picking between nonfeasance, misfeasance and malfeasance.... I think the State ... should elect which one they're going under." Such statements clearly do not qualify as an objection to the trial judge's amended instruction that followed. Because defense counsel did not object to the amended instruction, we will review the instruction only

to determine if it involved plain error. Md.Rule 4–325(e). We perceive no error at all since the State was obviously relying on the facts constituting malfeasance as alleged in the indictment, and quoted by Judge Woods, to establish misconduct.

> III. The Court erred by not granting Steffey's Motion for a New Trial based on the ground that since Steffey was found not guilty of all the predicate acts (Counts One to Five) alleged in Count Six the verdict could not stand.

█ Appellant acknowledges that inconsistent jury verdicts generally are not sufficient grounds for reversing a jury's verdict or granting a new trial. *See, e.g., Mack v. State*, 300 Md. 583, 594, 479 A.2d 1344 (1984); *Ford v. State*, 274 Md. 546, 552–53, 337 A.2d 81 (1975). He contends, however, that this rule does not apply to his case because "Count Six of the indictment does not merely stand alone as a separate legal theory for the same alleged criminal activity, but rather Count Six contains *within itself* certain specified predicate acts which constitute the crime." (Emphasis in original.)

Even though the misconduct alleged in Count Six does appear to consist only of criminal acts of which the jury found appellant not guilty, we cannot reverse appellant's conviction. As the Court of Appeals stated in *Mack, supra*, "That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." *Id.* at 594, 479 A.2d 1344 (quoting Justice Holmes in *Dunn v. United States*, 284 U.S. 390, 394, 52 S.Ct. 189, 191, 76 L.Ed. 356 (1932)).

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.