REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2768

September Term, 2010

IN RE: NICK H.

Krauser, C.J.,
Woodward,
Graeff,

JJ.

Opinion by Woodward, J.

Filed: September 29, 2015

On June 27, 2006, appellant, Nick H. (DOB: 3/29/90), entered a plea of involved to one count of sexual abuse of a five-year-old boy and two counts of second degree sexual offense against the same victim in the Circuit Court for Montgomery County, sitting as a juvenile court.[1] The juvenile court committed appellant to the Department of Juvenile Services for placement in a residential treatment center. Approximately ten months later, appellant was released from the treatment center and placed on probation with home electronic monitoring.

In 2009 and 2010, the Maryland General Assembly amended the Maryland sex offender registration act ("MSORA"), requiring, among other things, that certain juveniles convicted of various sex offenses and at significant risk of committing a sexually violent offense or a Tier II or Tier III sexual offense ("at significant risk of re-offending") to register as sex offenders upon leaving the jurisdiction of the juvenile court. *See* Md. Code 2001, 2008 Repl. Vol., 2010 Cum. Supp. § 11-704(a), (c) of the Criminal Procedure Article ("CP 2010").[2] As a result of these statutory changes, the State requested that appellant be placed on the sex offender registry, and the juvenile court conducted a hearing to determine whether

---

[1] On October 31, 2006, appellant proceeded by way of a not involved plea based upon an agreed statement of facts, and the juvenile court found him involved on a charge of sexual abuse of a minor as to a different victim. Although the cases were considered together for the purpose of review hearings monitoring Nick H.'s progress, the juvenile court's order that is the subject of this instant appeal relates only to the offenses involved in the June 27, 2006 plea.

[2] This opinion makes several references to different versions of the Maryland sex offender registration act ("MSORA"), so the date of each provision will be included following "CP" for clarification purposes.

appellant was at significant risk of re-offending. The court concluded, based on clear and convincing evidence, that appellant was at significant risk of re-offending and thus ordered him to register as a sex offender pursuant to MSORA.

Appellant now challenges the juvenile court's order. He presents two questions for our review, which we have rephrased:[3]

> 1. Did the juvenile court err in ordering appellant to register as a sex offender given the Court of Appeals' holding in *Doe v. Department of Public Safety & Correctional Services*, 430 Md. 535 (2013) ("*Doe I*"), that retroactive registration is a violation of the constitutional prohibition against *ex post facto* laws?
>
> 2. Was appellant entitled to specific performance of his plea agreement, which did not include a requirement that he register as a sex offender?

---

[3] Appellant's original questions, as presented in his brief, are:

> 1. Given the highly punitive and restrictive nature of Maryland's newly enacted sex offender registration laws, does their retroactive application violate the federal constitutional ban on *ex post facto* laws and both clauses of Article 17 of the Maryland Declaration of Rights prohibiting *ex post facto* laws and *ex post facto* restrictions?
>
> 2. Given that the plea agreement entered into by Nick H. did not, and indeed could not, contemplate registering as a sex offender, is he entitled to specific performance of the plea agreement?

Appellant submitted these questions prior to the Court of Appeals' decision in *Doe v. Department of Public Safety & Correctional Services*, 430 Md. 535 (2013) ("*Doe I*"), and did not submit any additional questions in his supplemental brief responding to the *Doe I* decision.

For the reasons set forth below, we answer both questions in the negative and affirm the juvenile court's order requiring appellant to register as a sex offender.

**BACKGROUND**

On June 27, 2006, appellant pleaded involved to one count of sexual abuse of a minor and two counts of second degree sexual offense. The State's proffer revealed that, while appellant babysat five-year-old A. H. and his two older brothers, appellant sodomized A. H. and forced A. H. to perform fellatio on him. Appellant initially denied sexual contact with the victim, but after further questioning admitted that he "had put it in [A. H.'s] mouth about midway down the tongue." Appellant was fifteen years old when the abuse occurred.

The juvenile court accepted appellant's plea, and appellant was placed in a residential treatment center for about ten months. Upon release from the treatment center in June 2007, appellant was placed on probation, and for the following three and one-half years the juvenile court monitored appellant's progress in outpatient sex offender treatment through regular review hearings.

In 2009 and 2010, the Maryland General Assembly amended MSORA. One such amendment allowed, under specific circumstances, the juvenile court to order juvenile offenders who had been adjudicated involved in certain sexual offenses to register as sex offenders when they left the jurisdiction of the juvenile court.[4] *See* CP 2010 §§ 11-704(a),

_____

[4] As a result of the 2010 amendments, a separate registry for juvenile sex offenders who were still under the jurisdiction of the juvenile court was also created. *See* Md. Code
(continued...)

3

(c). In response to this change, on October 7, 2010, the State requested that the juvenile court order appellant to register as a sex offender.

Based on the new law and the State's requests, the juvenile court conducted a hearing on December 15 and 21, 2010, to determine whether appellant should be placed on the sex offender registry. The court's decision considered only the testimony and reports presented at the hearing.

In rendering its opinion, the juvenile court noted that appellant "committed sexual acts with [A. H.] maybe 50 times. 20 times included penetration, and there were also offenses that included fellatio . . . ." In addition, the court stated that, "I think maybe there was one event that involved [A. H.]'s brother," and "that there was also another youngster involved by the name of [L. F.] . . . . [T]here was denial as to [L.F.] [ ] for a long time, for 20 months or so, almost two years."

The juvenile court reviewed the testimony and reports of the three witnesses who testified at the hearing. Dr. Ronald I. Weiner, an expert in adult and juvenile sex offender risk assessments and treatment, provided an independent evaluation of appellant, the findings of which were memorialized in a detailed, thirty-page risk assessment report. Dr. Weiner testified to his findings at the hearing. The court described Dr. Weiner as "neutral," and thus determined that "his testimony and his report [were to be given] significant weight." The

---

[4](...continued)
(2001, 2008 Repl. Vol., 2010 Cum. Supp.), § 11-704.1 of the Criminal Procedure Article. This section does not apply to appellant, however, and will not be considered here.

court also heard testimony from Ta-Keisha Smith, appellant's case manager, who the court also found to be "very credible." Dr. Fred Berlin, appellant's treating physician for his sex offender treatment, also testified. Because Dr. Berlin was appellant's treating physician, he was not asked to perform an independent evaluation. Regarding Dr. Berlin's opinion, the court stated: "I am forced to give his testimony far less weight. I, he came across in the Court's opinion, as an advocate."

Based on the witnesses' testimony, Dr. Weiner's report, and "various psycho sexual reports" from the years appellant was supervised while in placement and on probation, the juvenile court found that appellant was "a highly sexualized young man." The court explained that, when appellant first came into the system,

> both Dr. Weiner and Dr. Berlin reported the significant level of abuse and criminal activity that [appellant] was involved in, back for this four plus years. Dr. Weiner described it as egregious and predatory.
>
> ***
>
> [T]hey noted that [appellant] had not only this criminal history, but there was, I guess what the Court can fairly describe as a highly, a highly sexualized young man. Not just back when he was 11 to almost 16, but thereafter. . . . [H]e acknowledged, I guess, maybe 20 sexual partners. I'm not talking about young children, I'm talking about peers. He acknowledged having sex at least three times with someone who was drunk, masturbating in a public place, fondling the dog's genitals, phone sex, internet sex with female peers. So that we, and someone who, by his words, by [appellant's] own words, was perhaps addicted to pornography. So that's the presentation when [appellant] came into the system. And it was also the presentation, at least by history, that Dr. Weiner and Dr. Berlin were, and are working with.

5

The juvenile court expressed concern that appellant's behavior over the four and one-half years that he was monitored by the juvenile court raised questions about his honesty. The court stated that

> [appellant] has demonstrated some challenging behavior throughout the life of this case. Behavior that has involved deception, behavior that has involved avoidance, behavior that has involved downright lying . . . .
>
> \*\*\*
>
> There seems to be a pattern in [appellant's] behavior throughout the life of this case of denying, avoiding,—avoiding, denying, lying, polygraph, or some type of confrontation, admission, then denying again, and then admitting again.

The juvenile court pointed to numerous examples of appellant's deceptive behavior. Principal among them was that appellant did not "until very recently . . . reveal to anybody that he had been having a sexual relationship with a young girl when he was very young. He was maybe eight and the young girl was, I think, 11." The court found it "startling and troubling" that "someone that has been under this intense level of scrutiny in this particular field of psycho social treatment, to not disclose that for that long."

In addition to appellant hiding his sexual relationship at the age of eight, the juvenile court also described numerous instances of appellant lying to his parents and to Dr. Berlin. Appellant lied about his part-time employment, and denied being aroused by child pornography despite admitting that images of children, including an image of A. H., came to his mind while masturbating. The court stated that "it seems clear that [appellant] has, in

6

the past, had an addictive, an addiction to pornography and then that became an area of deception for him." That deception became apparent when appellant told Dr. Berlin in 2008 that he was no longer accessing pornography, but later stated that his use of pornography ended in late 2009.

Appellant also denied using illegal drugs until he tested positive in a random urinalysis. Despite the positive drug test, appellant continued to lie about the extent of his drug use, suggesting to his case manager that he had only used on his birthday, when in fact he had used regularly for a period of seven months. The juvenile court found this alarming, given that the drug use occurred "[w]hile on probation, and while under the strictest scrutiny by the Court." Although the court recognized that there were "some unfortunate lapses in this case," namely that appellant was not subject to random urine testing for three years of his probation, the court was particularly concerned that appellant took advantage of this lapse to regularly use drugs.

Because of the extent of appellant's deception, the juvenile court questioned appellant's seemingly good decisions. In 2008, appellant voluntarily agreed to take depo lupron, a drug that diminishes testosterone levels. The court stated that

> [i]t seems to be both key to Dr. Weiner and Dr. Berlin that he stay on this medication. It's also key to the Court that he stay on this medication. The problem with the Court is, the Court is going to lose jurisdiction in a few months, in March.
>
> ***
>
> And the question is, will he stay on it? . . . He went on the drug

7

voluntarily, which I think shows some good judgment on his part. Although, that has some issues around it as to why he did. He told Dr. Weiner—no, Dr. Berlin, that he was concerned as to his penis size. He was concerned as to the medication's affect on his weight. And he thought that it maybe would look good to the Court if he went on this medication.

Thus the court concluded that it had "no way of assuring [ ] that the odds are good that he's going to stay on [depo lupron]."

The juvenile court also pointed to Dr. Weiner's determination that "as a result of his testing, . . . there was evidence that [appellant] did not either acknowledge or understand the notion of his sexual, any sexual deviant pattern on his part, and his sexual acting out, which is concerning." Dr. Weiner "thought that all of the treatment that [appellant] had[] had was appropriate. He thought that the evaluations that he had[] were worthy and comprehensive. But at the end of it all [Dr. Weiner] says something to the effect of, I don't know whether [appellant] really has internalized this." The court pointed out as evidence of appellant's failure to internalize therapy that "at some place in this continuum of disclosure, [appellant] talked about grooming another young girl for possible molestation and then backed off of that."

These issues, plus appellant's deceptive behavior, led the court to state that "what we have in this case is a very disturbing confluence between what we do know and what we don't know." This confluence caused the court to worry about appellant's future risk of re-offending:

So in terms of what we know and what we do not, Dr. Weiner

8

was quite clear when he was talking about risk, that he saw a major issue in the fact that, as he expressed it, he had no way of assessing or determining what [appellant's] sexual arousal patterns are because there's no objective tools. There's no objective tools that were used to determine this. This is also very troubling because [appellant] has been in therapy for such a long time and the issue has been child molestation. And the issue has been deviant sexual behavior. . . .

[Appellant] has denied that he, he has denied that he has any sexual, deviant sexual arousal patterns as it revolves around children. But he's denied a lot of things. He denied using drugs when he was using them. He denied alcohol when he, you know, has been drinking—well, not lately, hopefully, since he was 11 or 12. He has denied pornography over time, when he was with Dr. Berlin.

The juvenile court agreed with Dr. Weiner's assessment that appellant presents "an unspecified risk," and that "what we don't know" is "very important." Dr. Weiner suggested that it was the healthcare community's duty to monitor appellant to prevent a relapse, but the court observed that appellant would no longer be monitored after he left the jurisdiction of the juvenile court. According to the court, "[h]e can do whatever he wants when he's 21. He doesn't have to live [at] home. He can take medicines or not. He can live at his parents[' home]. He can live somewhere else."

The juvenile court concluded that placing appellant on the sex offender registry would be the best option for continuing treatment of appellant and ensuring the safety of the community:

We must maintain leverage in the treatment. We can't leave it up to him. That is what Dr. Weiner said, he, meaning [appellant], has a lot to overcome in terms of his offenses. . . .

And Dr. Berlin's testimony was: "He said he would continue

9

[treatment], and I believe him."

Putting someone on a sex registry, it is what it is. No one pretends that it's a direct treatment. It is community safety. It is something that the legislature has seen fit to place into our statutes.

I don't rule out the possibility, however, that it may have some therapeutic value. Just the fact that it is in place, may have some type of leverage on [appellant] so that he understands that, [although] not under this Court's jurisdiction, there is a continuing interest in him and his well being, and in the community's well being. That, in and of itself, may influence him to continue with his treatment.

The juvenile court also indicated that appellant would have the opportunity to be removed from the registry if he could prove to the court that he was no longer at significant risk of re-offending:

[T]he statute includes an opportunity for someone on the registry to come back before the Court within the five years to modify placement on the registry. If [appellant] is serious about his treatment and he continues in his treatment; and perhaps at some future date, I don't know what it is, whether it's six months, or whether it's two years, or something else entirely, coming off of the depo [lupron]; and he demonstrates pro social activities; and there is perhaps some objective evidence of non-deviant sexual arousal patterns around children; and we have some solid evidence as to what we're looking at, he has the opportunity to come before the Court within this five year period. I think that is huge leverage in this case.

Thus the juvenile court found "by clear and convincing evidence that [appellant], this young man, is at significant risk [of re-offending] as indicated in the statute," and, as a result, by Order dated December 27, 2010, placed appellant on the sex offender registry.[5]

---

[5] The juvenile court issued its Order on December 27, 2010, but gave its reasons for
(continued...)

Appellant timely filed this appeal challenging the juvenile court's December 27, 2010 Order. Additional facts will be set forth below as necessary to resolve the questions presented.

## STANDARD OF REVIEW

Maryland Rule 8-131(c) governs the standard of review in juvenile matters:

> **Action tried without a jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Whether the circuit court erred in ordering appellant to register as a sex offender is a question arising under the *ex post facto* clauses of the federal and state constitutions. "[W]here an order involves an interpretation and application of Maryland constitutional, statutory or case law, [the appellate court] must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *Schisler v. State*, 394 Md. 519, 535 (2006) (quoting *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 383 (2006)).

## DISCUSSION

### I. *EX POST FACTO* CHALLENGE

#### (A) *Doe I*

---

[5](...continued)
that Order on the record in open court on January 13, 2011.

In March 2013, the Maryland Court of Appeals decided *Doe I*. This Court

summarized the facts and holding of *Doe I* in *Quispe del Pino v. Maryland Department of*

*Public Safety & Correctional Services*, 222 Md. App. 44 (2015):

> The pertinent facts in *Doe I* are as follows:
>
> In 2006, Doe pled guilty to and was convicted in the
> Circuit Court for Washington County of a single count
> of child sexual abuse arising out of an incident
> involving inappropriate contact with a thirteen-year-old
> student that occurred during the 1983-84 school year
> when Doe was a junior high school teacher. Doe was
> sentenced to ten years incarceration, with all but four
> and one half years suspended, and three years
> supervised probation upon his release. Although Doe's
> plea agreement did not address registration as a sex
> offender as one of the conditions of probation, Doe was
> ordered at sentencing to "register as a child sex
> offender." He was also ordered to pay a $500 fine.
> Following his sentencing, Doe filed a Motion to Correct
> an Illegal Sentence challenging both the fine and the
> requirement that he register as a child sex offender. The
> Circuit Court agreed with Doe and issued an order
> striking the fine and the registration requirement. Doe
> was released from prison in December 2008. On
> October 1, 2009, Doe's probation officer directed him
> to register as a child sex offender. Doe maintained that
> he did not agree with the requirement, but, against the
> advice of counsel, he registered as a child sex offender
> in early October 2009.
>
> The requirement that Doe register as a sex offender was a
> result of the 2009 amendment to MSORA retroactively requiring
> offenders who were convicted on or after October 1, 1995, but
> committed a sexual offense before that date, to register for the first
> time. In October 2009, Doe brought a declaratory judgment suit in the
> circuit court, seeking an order that he was not required to register as
> a sex offender. Doe argued that a registration requirement would

12

make his plea invalid as involuntary, because he was not informed that he would have to register as a sex offender when he entered into the plea agreement in 2006. The State argued that the requirement did not violate the prohibition against *ex post facto* laws. The trial court agreed with the State and ordered that Doe "shall not be removed from the sex offender registry."

After this Court affirmed the circuit court, the Court of Appeals granted *certiorari* and reversed our decision. In a plurality opinion, the Court of Appeals held that "requiring [Doe] to register as a result of the 2009 and 2010 amendments violates the prohibition against *ex post facto* laws contained in Article 17 of the Maryland Declaration of Rights." The three-judge plurality explained that "in many contexts," the Maryland Declaration of Rights offers broader protections than the United States Constitution. The plurality further determined that *ex post facto* claims under Article 17 should be analyzed by using the "disadvantage" standard, under which "any law passed after the commission of an offense which . . . in relation to that offense, *or its consequences*, alters the situation of a party to his [or her] disadvantage" violates Article 17.

Specifically, under the disadvantage standard, "Article 17 prohibits the retroactive application of laws that have the effect on an offender that is the equivalent of imposing a new criminal sanction or punishment." The plurality determined that requiring Doe to register had "essentially the same effect" as placing him on probation, that "probation is a form of a criminal sanction," and that "applying the statute to [Doe] effectively imposes on him an additional criminal sanction" for a crime committed in the 1980s. The plurality also concluded that the dissemination of Doe's information pursuant to MSORA was "tantamount to the historical punishment of shaming," and thus imposed an additional sanction for Doe's crime. Therefore, according to the plurality, the retroactive application of MSORA to Doe, which had the effect of imposing the additional sanction of probation and shaming, violated the *ex post facto* prohibition contained in Article 17 of the Maryland Declaration of Rights.

Judge McDonald (joined by Judge Adkins) concurred with the plurality's conclusion that the statute violated Article 17, but, in contrast to the plurality, read Article 17 *in pari materia* with Article

13

I, § 10 of the United States Constitution. Judge McDonald's concurrence stated further that "the cumulative effect of [the] 2009 and 2010 amendments of the State's sex offender registration law took that law across the line from civil regulation to an element of the punishment of offenders." Although his concurrence did not expressly state the test that was used, both the language of the concurrence and the two law review articles cited therein lead us to conclude that Judge McDonald analyzed the issue under the "intent-effects test."

The United States Supreme Court explained the "intent-effects" test in *Smith v. Doe*:

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'"

Stated another way, the "intent-effects" test requires a reviewing court to engage in a two-part inquiry: "first, the court must consider the legislative intent of the statute; second, even if the statute's stated purpose is non-punitive, the court must assess whether its effect overrides the legislative purpose to render the statute punitive." Therefore, by declaring that the 2009 and 2010 amendments "took that law across the line from civil regulation to an element of the punishment of offenders," Judge McDonald's concurring opinion found a violation of the State and federal *ex post facto* clauses under the "intent-effects" test.

Judge Harrell, writing separately, concurred in the judgment that Doe was entitled to relief, because his 2006 plea agreement "d[id] not indicate that sex offender registration was a term" of the agreement. Judge Harrell, however, would have denied Doe's *ex post facto* claims under the "intent-effects" test established in *Smith v. Doe*. Lastly, Judge Barbera (now Chief Judge) dissented and, using the "intent-effects" test, would have upheld the 2009 and 2010

14

> amendments to MSORA under both the State and federal constitutions.
>
> Although the Court ultimately held that "the retroactive application to Doe of Maryland's sex offender registration statute violated Article 17 of the Maryland Declaration of Rights," the divided Court did not reach a holding on whether to apply the "disadvantage" standard or the "intent-effects" test to future *ex post facto* challenges to MSORA.

*Quispe del Pino*, 222 Md. App. at 52-56 (italics and alterations in original) (citations omitted).

Because *Doe I* is a plurality decision, we employ the *Marks* Rule to determine the Court's holding: "'[W]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of [four judges], the holding of the court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" *Wilkerson v. State*, 420 Md. 573, 594 (2011) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)). Thus the *Marks* Rule requires us to determine the common thread running through the plurality and concurring opinions of *Doe I*. *See, e.g.*, *Derr v. State*, 434 Md. 88, 115 (2013) (concluding that, under the *Marks* Rule, the narrowest holding of the Supreme Court's decision in *Williams v. Illinois*, 132 S. Ct. 2221 (2012), was the position representing the common point of agreement between the plurality and concurring opinions), *cert. denied*, 134 S. Ct. 2723 (2014).

In *Doe I*, the decision that MSORA violates the Article 17 ban on *ex post facto* laws is the common denominator representing the position taken by five judges who agreed that

15

Doe should be granted relief.[6]  *See* 430 Md. at 568, 578.  Because the *Marks* Rule directs us

to the narrowest ground common to the plurality and the concurrence, Judge McDonald's

interpretation of Article 17 as read *in pari materia* with the less expansive federal *ex post*

*facto* clause represents the "position taken by those Members who concurred in the judgment

on the narrowest grounds."  *See Wilkerson*, 420 Md. at 594 (concluding that Justice

Kennedy's concurrence represented the narrowest opinion of the Supreme Court in *Missouri*

*v. Seibert*, 542 U.S. 600 (2004)).

We recognize, however, that in reaching its holding in *Doe I*, three members of the

Court applied the disadvantage test (the plurality opinion), while only two applied the intent-

effects test (Judge McDonald's concurrence).  *See Doe I*, 430 Md. at 568, 578.  Thus neither

test commanded a majority of the Court.  Nevertheless, we decide that the intent-effects test

is the proper test to determine whether MSORA violates Article 17 as applied to appellant.

The Court of Appeals used the intent-effects test in *Young v. State* to review a due

process challenge to MSORA.  370 Md. 686, 711 (2002).  The Court based its decision to

use this test on two Supreme Court cases that employed the intent-effects test to determine

---

[6] Although Judge Harrell concurred in *Doe I*, his opinion is not included in a *Marks*
analysis, because his reasoning, that Doe's plea agreement precluded any obligation to
register, is not part of the common point of agreement between the majority of judges.  *See*
*Doe I*, 430 Md. at 576-77 (Harrell, J., concurring); *see also A.T. Massey Coal Co., Inc. v.*
*Massanari*, 305 F.3d 226, 236 (4th Cir. 2002) ("The *Marks* rule does not apply . . . unless the
narrowest opinion represents a common denominator of the Court's reasoning and embodies
a position implicitly approved by at least [four judges] who support the judgment." (citations
and internal quotation marks omitted)), *cert. denied*, 538 U.S. 1012 (2003).

whether civil regulations connected to criminal activity could be construed as punishment for double jeopardy and *ex post facto* purposes. *Id.* at 711-12 & n.11 (referencing *United States v. Ursery*, 518 U.S. 267 (1996) (double jeopardy claim), and *Kansas v. Hendricks*, 521 U.S. 346 (1997) (double jeopardy and *ex post facto* claims)). Although the plurality opinion in *Doe I* points to various Maryland cases that have used the disadvantage test in the *ex post facto* context since the *Young* decision, *Young* is the only decision in this jurisdiction prior to *Doe I* that considered the constitutionality of MSORA specifically. *See Doe I*, 430 Md. at 553-55 (plurality opinion). *Young* is thus the most relevant precedent available to us in determining which test to use in the case *sub judice*.

We note, however, that the precedent set in *Young* extends only to the test to be applied. The *Young* decision interpreted the 2000 version of MSORA, prior to the enactment of the 2009 and 2010 amendments. *Young*, 370 Md. at 690. As Judge McDonald pointed out in his concurrence in *Doe I*, the sex offender registration scheme has changed significantly in recent years, and thus an analysis of MSORA under the intent-effects test has changed dramatically. *See Doe I*, 430 Md. at 578 (McDonald, J., concurring). With this point in mind, we turn to the application of MSORA to appellant under *Doe I*.

### (B) Retroactive Application of MSORA to Appellant

"To prevail in an *ex post facto* claim, [appellant] must first show that the law that [he is] challenging applies retroactively to conduct that was completed before the enactment of the law in question . . . ." *Dep't of Pub. Safety & Corr. Servs. v. Demby*, 390 Md. 580, 593

n.10 (2006) (emphasis omitted). In the case *sub judice*, appellant entered a plea of involved in June of 2006 to one count of sexual abuse of a minor and two counts of second degree sexual offense. At the time of his plea in 2006, appellant was sixteen years old and, because he was a juvenile, was not required to register as a sex offender in Maryland. *See* CP 2005 § 11-704 (lacking a juvenile sex offender registry and not requiring that former juvenile offenders register on the adult sex offender registry upon leaving the jurisdiction of the juvenile court).

In 2009 and 2010, the Maryland General Assembly amended MSORA to require certain juvenile offenders to register as sex offenders once they left the jurisdiction of the juvenile court. *See* CP 2010 §11-704(c).[7] CP 2010 §11-704(c) requires:

> (c) *Registration by person who was adjudicated delinquent at time of act.*—(1) **A person who has been adjudicated delinquent for an act that, if committed by an adult, would constitute a violation of** § 3-303, § 3-304, § 3-305, or **§ 3-306 of the Criminal Law Article**, or § 3-307(a)(1) or (2) or § 3-308(b)(1) of the Criminal Law Article involving conduct described in § 3-301(f)(2) of the Criminal Law Article, **shall register with the person's supervising authority if:**
>
> (i) the person was a minor who was at least 13

---

[7] The 2009 amendment first provided for the possibility that juvenile offenders register as sex offenders once they left the jurisdiction of the juvenile court. *See* CP 2009 § 11-704(c). Although the phrasing of the registration requirement for juveniles aging out of the juvenile system changed in 2010, the content did not. *Compare* CP 2010 § 11-704(c) *with* CP 2009 § 11-704(c). Because CP 2010 § 11-704(c) is the current statement of the law and was the version in effect at the time the State requested that appellant be placed on the sex offender registry, we refer to it here to demonstrate the requirements of the statute as they applied to appellant. *See* CP 2014 § 11-704(c); Effect of amendments, CP 2010 § 11-704(c).

years old at the time the delinquent act was committed;

(ii)     the State's Attorney or the Department of Juvenile Services requests that the person be required to register;

(iii)    90 days prior to the time the juvenile court's jurisdiction over the person terminates under § 3-8A-07 of the Courts Article, **the court, after a hearing, determines under a clear and convincing evidence standard that the person is at significant risk of committing a sexually violent offense or an offense for which registration as a tier II sex offender or tier III sex offender is required**; and

(iv)     the person is at least 18 years old.

(Emphasis added).

The framework of CP 2010 § 11-704(c) clearly applies to appellant. He was adjudicated delinquent of second degree sexual offense, which is prohibited by Section 3-306 of the Criminal Law Article;[8] he was over thirteen years old at the time of the offense; the State requested that appellant be required to register as a sex offender; the juvenile court determined by clear and convincing evidence that appellant was at significant risk of re-offending; and appellant was over eighteen years old when his registration began.

The 2010 amendments to MSORA also state that "this subtitle shall be applied

---

[8] Appellant also entered a plea of involved to one count of sexual abuse of a minor in violation of Section 3-602 of the Criminal Law Article. A violation of Section 3-602 is not listed in CP 2010 § 11-704(c)(1) as a basis for requiring the registration of a juvenile who violated that section.

19

retroactively to include a person who . . . is under the custody or supervision of a supervising authority on October 1, 2010." CP 2010 § 11-702.1(a)(1). "Supervising authority" is defined as, among other entities, "the Secretary of Juvenile Services, if the registrant was a minor at the time the act was committed for which registration is required." CP 2010 § 11-701(n)(10). On October 1, 2010, appellant was on probation under the supervision of the Department of Juvenile Services, as well as under the juvenile court's jurisdiction. While on probation, appellant was subject to ongoing review hearings before the juvenile court and active home electronic monitoring; he was required to attend various treatment clinics, to submit to frequent and random drug tests, and to meet regularly with his juvenile probation officer. Appellant was therefore clearly "under the custody or supervision of a supervising authority on October 1, 2010." CP 2010 § 11-702.1(a)(1).

Because the 2010 amendments apply retroactively, and appellant was subject to the requirements of CP 2010 § 11-704(c) based on conduct that occurred in 2005, prior to the 2010 amendments, we conclude that appellant has satisfied the first step in an *ex post facto* analysis. *See Demby*, 390 Md. at 593 n.10. We next turn to whether the application of CP 2010 § 11-704(c) to appellant violates the prohibition against *ex post facto* laws in light of *Doe I*.

### (C) Intent-Effects Test

Appellant contends that he is entitled to relief based on the *Doe I* Court's conclusion that the retroactive application of MSORA is unlawful. Arguing that Doe and appellant were

both subject to "punishment" under MSORA, appellant contends that nothing distinguishes his case from the *Doe I* plurality and Judge McDonald's concurring opinion. Although we note some similarities in the two cases, we conclude that the retroactive application of MSORA as applied to appellant is not "punishment" under the intent-effects test, and therefore is not a violation of the prohibition against *ex post facto* laws contained in Article 17. We shall explain.

### 1. Legislative Intent

As stated above, to determine whether MSORA violates the constitutional prohibition against *ex post facto* laws, we apply the intent-effects test. The intent-effects test is a two-step process:

> We must ascertain whether the legislature meant the statute to establish civil proceedings. If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention to deem it civil.

*Smith v. Doe*, 538 U.S. 84, 92 (2003) (alteration in original) (citations and internal quotation marks omitted). "[W]here a legislative restriction is an incident of the State's power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment." *Id.* at 93-94 (citations and internal quotation marks omitted).

Although no statement of purpose is expressly set forth in MSORA, its history and

21

language suggest that it is not intended to be punitive. In *Young*, the Court of Appeals discussed the legislative purpose of a previous version of MSORA, then set forth in former Article 27, § 792:

> As enacted, § 792 contained no express statement of purpose. Although it was placed within Article 27 and recodified in the Criminal Procedure Article, its location within the criminal procedure laws does not necessarily indicate an intent on the part of the General Assembly to *punish* sex offenders. . . . Therefore, in examining the purpose of the statute, we look primarily to the plain language. With respect to the determination of legislative intent, we conclude that the plain language and overall design of § 792 clearly indicate that it was not intended as punishment, but rather was intended as a regulatory requirement aimed at protection of the public. There is no indication in the statutory scheme that the General Assembly intended registration or notification as a device to punish convicted sex offenders.

370 Md. at 712 (italics in original). When the requirement of registration for certain juvenile sex offenders was added to MSORA by the 2009 amendment, there was nothing in the language of that provision, nor in its legislative history, to indicate a legislative intent different from that which was articulated by the Court of Appeals in *Young*. *See* 2009 Md. Laws, Chap. 524. We therefore conclude that CP 2010 § 11-704(c) is intended to be civil, rather than penal.

## 2. Punishment or Non-Punitive Effect

The intent-effects test next directs us to determine whether the statute's effect "overrides the legislative purpose to render the statute punitive." *Doe I*, 430 Md. at 570 (Harrell, J., concurring) (footnote omitted). Factors derived from the Supreme Court's

22

decision in *Kennedy v. Mendoza-Martinez* assist us in analyzing whether an otherwise regulatory statute becomes punitive. 372 U.S. 144 (1963). These factors include, but are not limited to:

> [1] [w]hether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment[, 3] whether it comes into play only on a finding of *scienter*, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned . . . .

*Id.* at 168-69 (footnotes omitted). In *Doe I*, Judge McDonald concluded that "the cumulative effect of [the] 2009 and 2010 amendments . . . took that law across the line from civil regulation to an element of the punishment of offenders." 430 Md. at 578 (McDonald, J., concurring). The question before us is whether the cumulative effect of the MSORA amendments regarding juvenile sex offenders codified in CP 2010 § 11-704(c) has caused the statute to cross the line drawn in *Doe I*. We conclude that the statute has not crossed such line.

(a) Affirmative disability or restraint

We turn first to whether MSORA involves an affirmative disability or restraint. Appellant argues that many of the registration requirements outlined in *Doe I* are also applicable to him, including:

> [R]eport[ing] in person to law enforcement every three months, giv[ing] notice to law enforcement of his address and any changes of

23

> address, and notify[ing] law enforcement before being away from his home for more than seven days. Furthermore, he must disclose to the State a significant amount of information, some of which is highly personal, including: his employment address; information about his conviction; his social security number; his email address and computer log-in names; information about vehicles he often uses, including those not owned by him; his finger prints and palm prints; all "identifying factors, including a physical description," and an updated digital image of himself. Additionally, other than to vote, [appellant] is prohibited from entering onto real property that is used as a school or a family child care center . . . without first obtaining permission. If [appellant] fails to comply with these requirements, he faces terms of imprisonment, depending on the violation, of up to three or five years.

*Doe I*, 430 Md. at 562 (plurality opinion) (citations omitted).

The State counters that, despite these significant requirements, appellant's situation is distinguishable from *Doe I*. As the State correctly points out, appellant's "period of registration is much less than that required of Tier III offenders who committed similar offenses after they reached the age of majority."

Appellant was adjudicated delinquent by the juvenile court for committing two counts of second degree sexual offense. Because of appellant's adjudication as a delinquent, appellant's registration term is limited to five years. *See* CP 2010 § 11-707(a)(4)(iv). If appellant had been charged with second degree sexual offense as an adult, however, he would have been categorized as a Tier III offender and thus would have been subject to a lifelong registration requirement. *See* CP 2010 §§ 11-701(q)(1)(ii), -707(a)(4)(iii).

Both Doe and appellant experienced an increase in the length of their respective registration requirements as a result of the 2009 and 2010 MSORA amendments. Doe's

24

registration requirements, which initially did not exist, automatically increased to lifelong registration. *Doe I*, 430 Md. at 540 (plurality opinion). Appellant's registration requirements, which initially did not exist, increased to a five-year period of registration after the juvenile court determined that appellant was at significant risk of re-offending, but also allowed appellant to petition the court to reduce his registration term. *See* CP 2010 § 11-707(a)(4)(iv). The difference between the length of Doe's and appellant's registration terms is stark, and only a former juvenile sex offender has the opportunity to be removed from the sex offender registry prior to the expiration of his registration term.[9] Nevertheless, because any period of registration imposed on appellant constitutes an affirmative disability, and the *ex post facto* prohibition applies to any increase in punishment or sanction, *see Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798), we conclude that the first factor weighs in favor of appellant.

## (b) Historical perspective

Second, we consider whether the regulation has been regarded historically as punishment. As the plurality in *Doe I* noted, "requiring [Doe] to register has essentially the same effect on his life as placing him on probation. It is well-settled in this State that

---

[9] A juvenile sex offender who has been required to register as a sex offender under CP 2010 § 11-704(c)(1) may file a petition for a reduction in the term of registration, and the juvenile court may reduce such term. *See* CP 2010 § 11-707(a)(4)(iv). The statute, however, does not specify what standard the juvenile court is to employ in deciding whether to grant or deny a reduction in the term of registration, nor what burden of proof the registrant must satisfy to obtain such reduction. *See id*.

25

probation is a form of a criminal sanction." 430 Md. at 561 (plurality opinion). In addition, according to the plurality, "the dissemination of [Doe's] information . . . is tantamount to the historical punishment of shaming." *Id.* at 564 (plurality opinion). Appellant's status as a Tier III sex offender, a color photo, his current home and employment addresses, his vehicle description and information, his physical features, and information about his offenses are all published on the Department of Public Safety and Correctional Services' website for the public to see. *See* Dep't of Pub. Safety & Corr. Servs., *Maryland SOR Search*, http://www.dpscs.state.md.us/sorSearch/search.do (last visited Sept. 9, 2015). As appellant points out, "[t]he purpose of keeping [juvenile] records confidential is to further the rehabilitation of young offenders by relieving them of the enduring stigma of their misconduct." *See District of Columbia v. Cooper*, 483 A.2d 317, 323 (D.C. 1984). Publishing information about former juvenile sex offenders on a public website hardly provides confidentiality, and instead creates the "enduring stigma of their misconduct." *Id.* Thus, in light of the plurality opinion in *Doe I* that the requirement of registration is similar to probation and the dissemination of offender information resembles shaming, the second factor weighs in favor of appellant.

### (c) *Scienter*

Next, we turn to whether the statute "comes into play only on a finding of *scienter*." *Mendoza-Martinez*, 372 U.S. at 168. CP 2010 § 11-704(c)(1)(iii) requires the juvenile court to determine, by clear and convincing evidence, that the juvenile sex offender "is at

26

significant risk of committing a sexually violent offense or an offense for which registration as a tier II sex offender or tier III sex offender is required" before ordering the offender to register. A determination that the juvenile sex offender is at significant risk of re-offending logically implies that the juvenile court must find a significant risk of future criminal intent on the part of the juvenile offender. Such finding of *scienter* differentiates CP 2010 § 11-704(c) from the adult registration requirements, which "appl[y] to individuals convicted of any of the enumerated offenses, without regard to the offender's state of mind." *Young*, 370 Md. at 715. Because "[t]he existence of a scienter requirement is customarily an important element in distinguishing criminal from civil statutes," we determine that this factor also weighs in favor of appellant. *See Kansas v. Hendricks*, 521 U.S. 346, 362 (1997).

(d) Promotion of traditional aims of punishment

The fourth factor asks us to consider "whether [MSORA's] operation will promote the traditional aims of punishment—retribution and deterrence." *Mendoza-Martinez*, 372 U.S. at 168. Because MSORA is intended to be only a civil regulation, we cannot conclude that the statute promotes retribution. *See Smith*, 538 U.S. at 93-94 ("[W]here a legislative restriction is an incident of the State's power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment." (citations and internal quotation marks omitted)).

Although not retributive, MSORA is intended to deter the commission of future sex crimes. *See Smith*, 538 U.S. at 102; *Young*, 370 Md. at 712. MSORA's requirements of

27

reporting, notification, and disclosure to law enforcement serve a deterrent function by continually reminding the registrant of the ever-present interest of law enforcement in the registrant's behavior. *See Young*, 370 Md. at 712. Moreover, as noted above, the public dissemination of offenders' information is similar to shaming, and thus acts to deter past offenders from re-offending, and may deter future offenders who are aware of the public consequences of sexual offenses.[10] *See Doe I*, 430 Md. at 564 (plurality opinion). A deterrent purpose, however, does not alone render the statute punitive. *See Smith*, 538 U.S. at 102 ("To hold that the mere presence of a deterrent purpose renders such sanctions criminal . . . would severely undermine the Government's ability to engage in effective regulation." (alterations in original) (citations and internal quotation marks omitted)); *Young*, 370 Md. at 715 ("Even an obvious deterrent purpose, however, does not make the law punitive, in as much as deterrence can serve both civil and criminal goals."). We also note that MSORA promotes public safety as much as it operates to deter potential offenders from committing sexual crimes. *See Young*, 370 Md. at 712. Because MSORA has both civil and deterrent purposes, but certainly is not intended to promote retribution, we conclude that the fourth factor is neutral.

---

[10] New research, however, suggests that sex offender statutes may not have the deterrent effect that the legislatures once hoped. *See, e.g.*, Amanda Y. Agan, *Sex Offender Registries: Fear Without Function?*, 54 J.L. & Econ. 207, 208 (2011) (explaining that statistical evidence does not suggest sex offender registration statutes are deterring past or future offenders); Catherine L. Carpenter, *Legislative Epidemics: A Cautionary Tale of Criminal Laws that Have Swept the Country*, 58 Buff. L. Rev. 1, 56-59 (2010) (same).

(e) Criminal nature of the behavior

Next, we consider whether the behavior to which MSORA applies is criminal. Although sex offender registration has a clear prerequisite of having committed an enumerated criminal sexual offense, the State suggests that, in the case of juvenile sex offenders, the registration requirement does not result from a criminal conviction, but instead from the juvenile court's registration order. According to the State, "[i]n contrast to the consequences attendant to criminal convictions, the purposes of the Juvenile Causes Act are not penal and juvenile delinquency proceedings in Maryland are conducted under a separate system of law, civil in nature." Appellant responds that, although juvenile cases are technically civil, not criminal, the nature of a juvenile proceeding does not affect the instant case.

We agree with appellant and conclude that the origin of the case *sub judice* in a juvenile, rather than in criminal court, is "a distinction without a difference." *In re Antonette H.*, 200 Md. App. 341, 344 n.1 (2011). "[O]nly a prosecutor can initiate juvenile delinquency proceedings [and the] proceeding is a prosecution in lieu of criminal proceedings." *In re Anthony W.*, 388 Md. 251, 266 (2005) (citations omitted). In addition, Maryland courts have recognized that juveniles in delinquency proceedings are afforded many of the same constitutional and common law rights as adults in criminal proceedings. *See, e.g.*, *In re Thomas J.*, 372 Md. 50, 57-59 (2002). Therefore, we conclude that, regardless of whether the offender is a juvenile or an adult, the behavior to which MSORA applies is criminal in

nature.

However, "this factor alone is not sufficient to render a regulatory statute punitive." *Young*, 370 Md. at 714; *see also Hendricks*, 521 U.S. at 362. The Court of Appeals has stated:

> There are many occasions when legislatures attach both criminal and civil sanctions to the same act or omission. The fact that the statute is triggered by a criminal conviction does not undermine the Legislature's intent to create a sex offender registry to aid in the civil purpose . . . . Thus, although the connection between sex offender registration and past criminal behavior is clear, we accord only limited weight to this factor in light of the equally strong connection between registration and legitimate civil purposes.

*Young*, 370 Md. at 714. Although MSORA applies to past criminal conduct in the case of a juvenile sex offender placed on the registry, the legislative intent to create a civil regulatory scheme is a weighty counterbalance. *See id.* Balancing the clear connections between criminal conduct and registration with the civil regulatory intent of the legislature, we conclude that this factor weighs slightly in favor of appellant.

(f) Alternative purpose

Turning to the sixth factor, it is clear, as noted above, that the 2009 and 2010 amendments to MSORA have a purpose other than punishment. The statute's goal is remedial in nature and "serves the important nonpunitive goal of alerting law enforcement and the community to the presence of sexual predators who may reoffend." *Id.* at 715. Although the *Young* decision discusses the purpose of a previous version of MSORA, and does not specifically address the registration of juvenile sex offenders who reach the age of

majority, this general statement of purpose, in our view, is applicable to the entire amended Act.

The public safety purpose of MSORA is especially apparent in the juvenile context. The registration statute requires the juvenile court to hold a hearing to determine whether juvenile sex offenders are at significant risk of re-offending, and thus only offenders who continue to threaten public safety are ordered to register. *See* CP 2010 § 11-704(c). Because the legislature clearly intended sex offender registration as a public safety mechanism, the sixth factor weighs in favor of the State.

(g) Excessive nature of sanction

Finally, we consider whether the sanction of MSORA is excessive despite its non-punitive purpose. This factor weighs the heaviest in our determination of whether MSORA, as applied to juvenile sex offenders placed on the sex offender registry, crosses the line from a civil regulation to a criminal punishment. *See, e.g.*, *Wallace v. State*, 905 N.E.2d 371, 383 (Ind. 2009) (affording the final *Mendoza-Martinez* factor "considerable weight," and citing cases from three other jurisdictions that found this factor to be the most significant). For reasons set forth below, we hold that the registration requirements are not excessive as applied to juvenile sex offenders who are placed on the registry.

Juvenile offenders who are adjudicated delinquent of a variety of sexual offenses, including a second degree sexual offense as appellant was here, may be required to register upon leaving the jurisdiction of the juvenile court. CP 2010 § 11-704(c). Before any

31

juvenile sex offender is placed on the registry, the State's Attorney or the Department of Juvenile Services must submit a request to the juvenile court that the subject juvenile be required to register. CP 2010 § 11-704(c)(1)(ii). In addition, the court must determine, after a hearing at least ninety days prior to termination of the juvenile court's jurisdiction over the juvenile, that "under a clear and convincing evidence standard[,] the person is at significant risk of committing a sexually violent offense or an offense for which registration as a tier II sex offender or tier III sex offender is required." CP 2010 § 11-704(c)(1)(iii). The court may also order an evaluation of the juvenile to aid in its decision. CP 2010 § 11-704(c)(4).

If the juvenile court decides that the juvenile sex offender should be placed on the registry, the court may order registration for a period of *up to* five years. CP 2010 § 11-707(a)(4)(iv). Thus the court has discretion to determine the actual period of the registration, but not more than five years. The court may also reduce the registration term originally ordered if the registrant requests a reduction, and the court agrees to such request.[11] *Id*.

In contrast, adult sex offenders are automatically placed on the registry if they have been convicted of an enumerated offense. CP 2010 § 11-704(a). They are provided no hearing or individualized assessment to determine whether they pose a continuing threat to society. Tier I offenders are required to register for fifteen years; Tier II offenders for twenty-five years; and Tier III offenders register for life. CP 2010 § 11-707(a)(4). Except

---

[11] *See* footnote 9, *supra*.

for a reversal, vacation, set aside, or pardon of the underlying conviction, Tier II and Tier III offenders have no process by which to remove their names from the registry or to reduce the terms of their registration. CP 2010 § 11-704(b). Tier I offenders shall have their registration term reduced to ten years, but only if, during those ten years, the registrant:

(1)     is not convicted of any offense for which a term of imprisonment of more than 1 year may be imposed;

(2)     is not convicted of any sex offense;

(3)     successfully completes, without revocation, any period of supervised release, parole, or probation; and

(4)     successfully completes an appropriate sex offender treatment program.

CP 2010 § 11-707(c).

One aspect of MSORA that was important to the holding of a violation of the constitutional prohibition against *ex post facto* laws by the Court of Appeals in *Doe I* and by this Court in *Quispe del Pino* was the automatic imposition of the registration requirement because of a conviction for a particular sex crime. *See Doe I*, 430 Md. at 568 (plurality opinion); *Quispe del Pino*, 222 Md. App. at 61. At the conclusion of the plurality opinion in *Doe I*, Judge Greene wrote:

> **Registration was imposed, over twenty years later in 2009, under the sex offender registration statute as a direct consequence of [Doe's] commission and conviction for his sex crime.** The application of the statute has essentially the same effect upon [Doe's] life as placing him on probation and imposing the punishment of shaming for life, and is, thus, tantamount to imposing an additional sanction for [Doe's] crime.

33

430 Md. at 568 (plurality opinion) (emphasis added).

In *Quispe del Pino*, this Court made a similar observation concerning the operation of MSORA:

> **[T]he retroactive application of the 2010 amendment automatically subjects appellant to registration under MSORA** for a period of time, fifteen years, during which time he otherwise would not have been subject to *any* of the statute's requirements, restrictions, or public dissemination of private information.

222 Md. App. at 61 (italics in original) (bold emphasis added). Thus a statutory scheme, like the one to which appellant is subject, that does not automatically impose a registration requirement, but mandates a court finding, based upon clear and convincing evidence adduced at a hearing, of a significant risk of re-offending, is more consistent with the regulatory purpose of MSORA than with any punitive effect. *See* CP 2010 § 11-704(c).

In states that have reviewed *ex post facto* challenges to retroactive sex offender registration schemes, whether the requirement of registration is based on an individualized assessment of the offender and whether the offender has the possibility of reducing his registration term have proved to be important considerations. Courts have held retroactive registration statutes not violative of the prohibition against *ex post facto* laws based, at least in part, upon the requirement of an individualized assessment of an offender to justify placement on the registry and the opportunity for an offender to seek reduction in the term of registration.

In *Doe v. Pataki*, the U.S. Court of Appeals for the Second Circuit reviewed the

retroactive application of New York State's sex offender law and determined that the statute did not constitute punishment under an *ex post facto* analysis. 120 F.3d 1263, 1265 (2d Cir. 1997), *cert. denied*, 522 U.S. 1122 (1998). Under New York law, persons subject to registration as a result of a conviction for a sexual offense are evaluated by a panel of experts on behavior and treatment of sex offenders for the offenders' "risk of recidivism" and "the degree of harm [that the offender] potentially presents." *Id.* at 1268. The evaluation occurs only when the offender is released, discharged, or paroled. *Id.* The sentencing court uses the evaluation to determine an appropriate length of the offender's registration term, and the amount of information the offender must provide. *Id.* at 1268-69. The offender may also challenge the expert's recommendation, and appear at the registration hearing with counsel. *Id.* After he or she is placed on the registry, the offender continues to have the ability to petition the court for relief from the registration requirements. *Id.* at 1282. Due to the relief available to registrants and the individualized assessment each offender is provided prior to being placed on the registry, the Second Circuit concluded that the statute remained a regulatory measure rather than a punitive sanction. *Id.* at 1281-83; *see also Cutshall v. Sundquist*, 193 F.3d 466, 474, 477 (6th Cir. 1999) (finding no *ex post facto* violation where law enforcement officials have the discretion to disclose registry information only when necessary to protect the public), *cert. denied*, 529 U.S. 1053 (2000).

By contrast, where registration schemes do not provide individualized risk assessments or an opportunity for offenders to be relieved of registration requirements, our

sister jurisdictions have held that retroactive registration violates the prohibition against *ex post facto* laws. In *Wallace*, the Indiana Supreme Court determined that, "if [sex offender] registration and disclosure [of offenders' information] are not tied to a finding that the safety of the public is threatened, there is an implication that the Act is excessive." 905 N.E.2d at 383. In addition, the Court stated that "we think it significant for this excessiveness inquiry that the Act provides no mechanism by which a registered sex offender can petition the court for relief from the obligation of continued registration and disclosure. Offenders cannot shorten their registration or notification period, even on the clearest proof of rehabilitation." *Id.* at 384 (footnote omitted). Based on the excessiveness of retroactive registration when no individual assessment is provided and registrants have no avenue for relief from registration, the Court concluded that Indiana's registration law was punitive. *Id.*

Maine's high court came to the same conclusion in *State v. Letalien*, 985 A.2d 4 (Me. 2009). In *Letalien*, a clinical psychologist performed a sex offender risk assessment on the appellee and determined that he presented "the lowest possible risk of reoffending." *Id.* at 8. However, because Letalien's crime triggered a mandatory registration requirement, he was ordered to register as a sex offender. *Id.* At the time of his offense, Letalien was required to register for fifteen years, but he could petition for a waiver of the registration requirements after his first five years of registration. *Id.* at 9. Years later, Maine's registration law was amended, and as a result, Letalien was required to register for the duration of his life without the possibility of a waiver. *Id.* at 10. These changes caused the

36

Supreme Judicial Court of Maine to conclude that the amended statute violated the prohibition against *ex post facto* laws, stating that the statute

> does not allow for a waiver of its requirements, nor does it condition an offender's duty to register or verify on an individualized determination of the offender's risk of re-offending; rather, its requirements are mandatory and attach strictly as a consequence of the conviction of a crime identified by the statute.

*Id.* at 15, 26.

The highest courts of Ohio, Alaska, and Kentucky all have reached the same conclusion as the Indiana and Maine courts. In *State v. Williams*, the Supreme Court of Ohio decided that, because "all the registration requirements apply without regard to the future dangerousness of the sex offender," retroactive application of sex offender registration requirements violated the prohibition against *ex post facto* laws. 952 N.E.2d 1108, 1113 (Ohio 2011). In Alaska, the Supreme Court pointed to the registrant's inability to petition the trial court for relief from the registration and disclosure obligations under Alaska's sex offender registration law as an important part of its holding that retroactive registration violated the *ex post facto* clause in the state constitution. *Doe v. State*, 189 P.3d 999, 1017 (Alaska 2008). Finally, the Supreme Court of Kentucky stated that, "[w]hen a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones." *Commonwealth v. Baker*, 295 S.W.3d 437, 444 (Ky. 2009), *cert. denied*, 559 U.S. 992

37

(2010).

In Maryland, juveniles adjudicated delinquent of certain sex offenses by the juvenile court are provided the same safeguards that our sister jurisdictions found important to upholding the retroactive registration laws against *ex post facto* challenges. As stated above, the State's Attorney or the Department of Juvenile Services must request that the juvenile sex offender be placed on the registry. CP 2010 § 11-704(c)(1)(ii). Once the request for registration is made, the juvenile court is charged with determining, after a hearing, whether the juvenile sex offender is "at significant risk" of re-offending based on clear and convincing evidence. CP 2010 § 11-704(c)(1)(iii). To aid in its assessment, the court can request an individualized evaluation of the offender. CP 2010 § 11-704(c)(4). Finally, if the juvenile sex offender is determined to be at significant risk of re-offending and placed on the registry, the juvenile court can decide the term of registration, up to a maximum of five years. CP 2010 § 11-707(a)(4)(iv). Thereafter, the former juvenile sex offender can petition the juvenile court for a reduction of the registration term. *Id.*

In the case *sub judice*, appellant was afforded all of the protections set forth in CP 2010 § 11-704(c). The juvenile court ordered an independent evaluation of appellant and spent two days taking testimony in order to determine whether appellant was at significant risk of re-offending. Based on the evidence admitted, the court determined, based on clear and convincing evidence, that appellant was at significant risk of re-offending, and ordered him to register for five years. The court even reminded appellant of the opportunity to have

38

his registration requirement reviewed:

> If [appellant] is serious about his treatment and he continues in his treatment; and perhaps at some future date, I don't know what it is, whether it's six months, or whether it's two years, or something else entirely, coming off of the depo; and he demonstrates pro social activities; and there is perhaps some objective evidence of non-deviant sexual arousal patterns around children; and we have some solid evidence as to what we're looking at, he has the opportunity to come before the Court within this five year period. I think that is huge leverage in this case.

Appellant was thus afforded, and reminded of, all the safeguards available to juvenile sex offenders prior to and after placement on the sex offender registry. Those same safeguards lead us to conclude that retroactive application of MSORA to appellant is not excessive given the regulatory purpose of sex offender registration.

### (D) Conclusion

Reviewing the *Mendoza-Martinez* factors together, we conclude that, although the requirement of registration imposes an affirmative disability on appellant, has been regarded historically as punishment, carries the element of *scienter*, and applies to behavior that is criminal in nature, these disadvantages are outweighed by the public safety purpose of MSORA and the process afforded juvenile sex offenders both before and after being ordered to register. MSORA requires an individualized assessment of a juvenile sex offender, under a clear and convincing evidence standard, before placement on the sex offender registry, and the opportunity to seek a reduction in the term of registration. By contrast, MSORA requires all adults convicted of certain sexual offenses to register as sex offenders for a specified term

regardless of their continuing threat to society. Therefore, the placement of some juvenile sex offenders on the sex offender register is explicitly tied to the regulatory purpose of sex offender registration.

"Because we ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (citations and internal quotation marks omitted). That "clearest proof" of a criminal penalty is not present here, and thus retroactive registration for juvenile sex offenders remains a civil remedy. Therefore, retroactive application of MSORA as applied to juvenile sex offenders under CP 2010 § 11-704(c) does not violate the prohibition against *ex post facto* laws under Article 17 of the Maryland Declaration of Rights, as read *in pari materia* with the U.S. Constitution. Because MSORA is constitutional as applied to appellant, we decline to grant him the relief he seeks on these grounds.

## II. SPECIFIC PERFORMANCE OF THE PLEA AGREEMENT

Appellant contends that, even if the retroactive application of CP 2010 § 11-704(c) to him does not violate the constitutional prohibition against *ex post facto* laws, he should be entitled to specific performance of his plea agreement, which did not require that he register as a sex offender. Relying on Judge Harrell's concurring opinion in *Doe I*, appellant points out that he could not have been required to register at the time of his plea, because no such requirement existed in 2006. As a result, appellant argues that no reasonable person "could

possibly have believed that registration would be part of the plea," and thus specific enforcement of his plea, which did not include registration, is required. Appellant contends that not enforcing the plea "would create a dangerous precedent allowing the State to add additional terms to a plea agreement at its whim anytime there was no specific mention of those terms made during the plea agreement." Finally, appellant argues that not enforcing his plea creates a disincentive for others to enter into plea agreements. We are not persuaded.

In *Doe I*, Judge Harrell argued that, under *Cuffley v. State*, 416 Md. 568 (2010), "[d]etermining the meaning of a sentencing term in a plea agreement requires strict adherence to the 'four corners' of the plea agreement as established in the Maryland Rule 4-243 plea proceeding and to 'due process concerns for fairness and adequacy of procedural safeguards.'" *Doe I*, 430 Md. at 576 (Harrell, J., concurring) (quoting *Cuffley*, 416 Md. at 580-81). The petitioner in *Cuffley* agreed to a plea deal wherein he pled guilty to robbery in exchange for a sentence within the sentencing guidelines of four to eight years. *Cuffley*, 416 Md. at 574. The trial court accepted Cuffley's plea and agreed to be bound by its terms. *Id.* At the disposition hearing several months later, however, the trial court sentenced Cuffley to fifteen years' incarceration, suspending all but six years. *Id.* Cuffley filed a Motion to Correct an Illegal Sentence, arguing that the sentence violated his plea agreement. *Id.* at 574-75. The Court of Appeals agreed with Cuffley, and concluded that a defendant must reasonably understand the terms of his sentence as they are presented in the "four corners" of the plea agreement. *Id.* at 581-82. Based on the decision in *Cuffley*, Judge Harrell stated

41

in *Doe I* that, "[a]ssuming that a registration term would be included in an agreement at Doe's 2006 plea hearing, a reasonable person in Doe's position likely would understand that registering as a sex offender was not a part of the agreement." *Doe I*, 430 Md. at 576 (Harrell, J., concurring).

Judge Barbera (now Chief Judge) disagreed with Judge Harrell, arguing that "*Cuffley* plainly does not apply to the case before us. *Cuffley* and the rule emanating from it focus on 'the meaning of the *sentencing term*,' and 'what the defendant reasonably understood to be the *sentence*.'" *Doe I*, 430 Md. at 598-99 (Barbera, J., dissenting) (italics in original) (quoting *Cuffley*, 416 Md. at 582). Because sex offender registration is "imposed mandatorily by operation of law," Judge Barbera stated that sex offender registration is a collateral consequence of a plea, and not part of the sentence imposed by the trial court. *Doe I*, 430 Md. at 600 (Barbera, J., dissenting). Judge Barbera concluded that

> [t]he requirement that [Doe] register as a sex offender likewise had no effect on the ultimate range of punishment he faced upon conviction. **Because sex offender registration is not punishment, but a collateral consequence of a conviction, it was not required to be included as part of [Doe's] plea agreement.**

*Id.* (emphasis added) (footnote omitted).

In *Sinclair v. State*, this Court held that sex offender registration is a collateral consequence of a conviction. 199 Md. App. 130, 135 (2011). In 2006, Sinclair pled guilty to child abuse that was sexual in nature and that had occurred from 1989 through 1994. *Id.* at 132-33. He was sentenced to four years of house arrest, with all but one year suspended,

and was placed on probation for five years. *Id.* The probation order did not include a requirement that Sinclair register as a sex offender. *Id.*

With the enactment of the 2009 MSORA amendments, however, child sex offenders "convicted on or after October 1, 1995, of an offense committed before October 1, 1995," were required to begin registering. CP 2009 § 11-702.1(c)(1)(ii). If offenders did not register, they were subject to criminal prosecution. CP 2009 § 11-721(b), (c). In response to the amended law and its retroactive application, Sinclair filed a motion, in the criminal case where he was convicted of the sexual offense, requesting a judicial determination that he not be required to register. *Sinclair*, 199 Md. App. at 134.

We denied Sinclair's request. *Id.* at 140. Although noting that relief by way of a declaratory judgment may be obtained prior to actual criminal prosecution when the constitutionality of a statute is at issue and violation of the statute carries criminal sanctions, we nonetheless concluded that "Maryland law does not recognize the filing of a declaratory judgment action in a criminal cause, even if the object of the declaratory judgment action is to obtain a ruling concerning a collateral consequence of the conviction." *Id.* at 137, 140 [12]

In reaching our decision, we stated that "[t]he thrust of Sinclair's motion is not collaterally to challenge his conviction that has long since been final and unappealable. His

_____

[12] A declaratory judgment action, which is *not* filed in the criminal case that resulted in a conviction giving rise to the requirement of registration, is the appropriate procedural vehicle to challenge the constitutionality of MSORA "when there is an actual controversy between the parties and the declaratory judgment will terminate the conflict." *Doe I*, 430 Md. at 545.

statutory construction point is directed to a collateral consequence of the conviction." *Id.* at 135. Implicit in this conclusion was that sex offender registration was not a part of Sinclair's original plea and conviction. *See id.* at 135-36. Instead, it was collateral to the criminal action. *Id.* at 135.

Maryland Rule 4-242(f) now expressly categorizes sex offender registration as a collateral consequence of a guilty plea. Appellant correctly notes that Rule 4-242(f) requires that the defendant be advised of a plea's collateral consequences, including sex offender registration, before the court accepts the plea. However, the Rule also states that "[t]he omission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid." Md. Rule 4-242(f). Indeed, the Court of Appeals has determined that only when direct consequences of a plea are not explained to a defendant will the plea be rendered involuntary. *Yoswick v. State*, 347 Md. 228, 239-40 (1997). In *Yoswick*, the Court of Appeals held that a guilty plea was not rendered involuntary even though the trial court did not inform the defendant that, "in order to become eligible for parole, he had to first serve fifteen years." *Id.* at 236, 241.

Turning to the case *sub judice*, we recognize that appellant's plea agreement did not include a registration requirement. Appellant contends that, because his plea did not mention registration, specific performance of that plea mandates that he not be required to register. Because the plea did not need to include sex offender registration, which is a collateral consequence of a guilty plea, appellant's argument fails.

44

Moreover, specific performance of a plea agreement only entitles appellant to either the "benefit of the bargain" or a withdrawal of the plea.[13] *Cuffley*, 416 Md. at 583. According to appellant, the benefit of the bargain in his plea agreement means that he is not required to register. The plea agreement's silence as to the issue of registration, however, did not suggest whether appellant would or would not be subject to a sex offender registration requirement. The juvenile court's order in 2010 that appellant register as a sex offender therefore did not violate his plea agreement. *See Doe I*, 430 Md. at 601 (Barbera, J., dissenting). Appellant's registration obligation is, again, simply a collateral consequence of his plea.

In sum, "[b]ecause sex offender registration is not punishment, but a collateral consequence of a conviction, it was not required to be included as part of [appellant's] plea agreement." *Id.* at 600 (Barbera, J., dissenting). Therefore, the lack of any reference to a requirement for sex offender registration in appellant's plea agreement cannot serve as a basis for implying a term in the plea agreement that appellant not be required to register as a sex offender. In other words, there is nothing in appellant's plea agreement for the trial court to specifically enforce.

Finally, we move to appellant's last two arguments. First, we disagree with appellant that a decision not to "enforce" appellant's plea as he desires will allow "the State to add

---

[13] Because appellant does not challenge the underlying conviction or the applicability of CP 2010 § 11-704(c) if deemed constitutional, there appears to be no basis for appellant to withdraw his plea.

45

additional terms to a plea agreement at its whim anytime there was no specific mention of those terms made during the plea agreement." We initially note that the State *cannot* add additional terms to a plea agreement that are direct consequences of a criminal conviction. *See Yoswick*, 347 Md. at 240. In the case of collateral consequences, Rule 4-242(f) specifically refers to two collateral consequences—immigration consequences and sex offender registry consequences. These consequences are beyond the power of the State to change, because they are imposed by the federal courts and agencies under federal law or they apply automatically by operation of Maryland law. In addition, in the case of juvenile sex offenders, the collateral consequence of registration is only a requirement after a hearing in which the judge must find by clear and convincing evidence that the individual is at significant risk of re-offending. CP 2010 § 11-704(c). The proof required to meet a clear and convincing evidence standard can hardly be described as allowing the State to add terms "at its whim."

Second, we disagree with appellant's assertion that not "enforcing" appellant's plea deal "creates a strong disincentive for defendants to plead guilty." As previously stated, juvenile sex offenders, like appellant, cannot be placed on the sex offender registry unless, after a hearing, the juvenile court finds, based on clear and convincing evidence, that the juvenile offender is at significant risk of committing a sexually violent offense or a Tier II or III offense. CP 2010 § 11-704(c). Therefore, the lack of notification that sex offender registration would be possible in appellant's 2006 plea does not create a disincentive for

46

others to enter plea agreements today.

**ORDER OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS A JUVENILE COURT, DATED DECEMBER 27, 2010 AFFIRMED; APPELLANT TO PAY COSTS.**