REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 724

September Term, 2016

In re: Misc. 4281

Wright,
Arthur,
Leahy,

JJ.

Opinion by Leahy, J.

Filed:  December 2, 2016

We are presented with an issue that sits at the juncture of the broad inquisitorial authority of the grand jury and the Fifth Amendment privilege of government employees against self-incrimination as expressed in *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).[1]  A grand jury sitting in Prince George's County (the "County") subpoenaed the County government to produce records, including employee interviews, that the County's Fire/Emergency Medical Services Department (the "Department") collected during an investigation into certain, potentially criminal, acts of its employees.  The County moved to quash the subpoena on the ground that producing those records would violate the employees' Fifth Amendment rights because employees implicated in the investigation made statements to investigators that were coerced under a Department policy that requires employees to cooperate with internal investigations under threat of losing their jobs.

After a hearing, the Circuit Court for Prince George's County issued an order denying the County's motion to protect the videos, dispatch calls, and witness statements, and granting the County's motion to protect the firefighters' coerced statements and the Department's investigation report.  The State appealed and presents the single question: "Did the circuit court erroneously quash that part of the grand jury subpoena seeking the involved firefighters' statements and the County Fire Department's investigatory report?"

On October 21, 2016, the State filed a motion for expedited decision, alerting this Court that the statute of limitations on any possible indictment for assault would run

---

[1] In *Garrity*, the Supreme Court held that the Fifth Amendment privilege against self-incrimination protects all government employees from the government's use in subsequent "criminal proceedings" of any statements coerced from them "under threat of removal from office."  385 U.S. at 500.

1

December 8, 2016. After hearing the appeal on November 7, 2016, this Court issued a *per curiam* order on November 23, 2016, reversing that part of the circuit court's April 12, 2016 order that granted the County's motion for protective order. This opinion explains that order.

We hold that the Fifth Amendment privilege against self-incrimination does not prohibit a grand jury from compelling the production of a public agency's internal investigative reports containing coerced self-incriminating statements of its employees. The employees may, however, move to suppress the evidence and its fruits if the government seeks to use them against the employees in a criminal proceeding.

## BACKGROUND

At the outset, we caution that by virtue of the secrecy historically afforded to grand jury investigations, the facts that form the crux of this grand jury's inquiry are largely unknown to this Court and are under seal. Our factual recitation is based exclusively on the publicly available transcript of the suppression hearing.[2]

On behalf of the State of Maryland, the grand jury in Prince George's County served a subpoena duces tecum on the Office of the County Attorney, as counsel for the Department. The subpoena requested the Department produce "any and all documents related to an investigation into an assault that took place on December 8, 2015 at 5409 75th Avenue, Hyattsville, Prince George's County, Maryland, during a fire at said location to

---

[2] After filing its notice of appeal, the State moved the circuit court to unseal the transcript from the April 11, 2016 hearing at which the court considered the County's motion to quash the subpoena. The County consented to the State's motion, and the court ordered the transcript unsealed on May 31, 2016.

include but not limited to videos, dispatch calls, witness and respondent statements and police reports." The County filed for a protective order in the Circuit Court for Prince George's County asking the court to quash the subpoena: (1) because it contained employee personnel records; and (2) because the County claimed that the report contained a number of "Garrity-related statements."

At the hearing on April 11, 2016, the County explained that two career firefighters filed with the Department a statement of charges against two volunteers involved in the alleged assault at 75th Avenue. In response, Department Battalion Chief Ava C. Hagood conducted an investigation and issued a report based on emails, photographs, a video clip, and a number of witness interviews. The County Attorney proffered that about a dozen of the witness statements—including a written statement from each of the firefighters involved in the altercation—were compelled under a Department policy that requires an employee to cooperate with internal investigations or lose his or her job. The County offered the investigation report for *in camera* review, but the court declined.

After taking the parties' arguments under advisement, the circuit court issued a protective order with respect to "the compelled statements of the respondent firefighters and the report proposed by the Fire Department's investigation[,]" but denied the protective order "as to videos, dispatch calls, and witness statements." The State noted its timely appeal to this Court.[3]

---

[3] Although not challenged by the County, we note that the State's appeal from the circuit court's order is properly before this Court. *See State v. Rice*, 447 Md. 594, 617-23 (2016). The general right of appeal from a final judgment entered in a civil or criminal case by a circuit court is found in Maryland Code (1973, 2013 Repl. Vol.), Courts and

**DISCUSSION**

We distill from the State's contentions of error three distinct challenges to the court's order. First, the State presents the unpreserved argument that, because the Fifth Amendment is a personal right, the Department lacked standing to assert the privilege on behalf of individual firefighters. Second, the State's central argument is that the Fifth Amendment is not implicated when a grand jury subpoenas and reviews documentary evidence containing potentially incriminating statements, even when the government has "coerced" the statements from its employees.[4] And third, the State argues that, should we

---

Judicial Proceedings Article ("CJP"), § 12–301. The exceptions and limitations to this general right to appeal are contained in CJP § 12–302, which in turn limits the State's right to appeal in a "criminal case" to a few enumerated circumstances. CJP § 12–302(c). In *Rice*, the Court of Appeals explained that just because a motion, such as a motion to compel testimony, is filed in association with a criminal case, it does not follow that the proceeding arising from the motion must be criminal in nature. *Id.* The Court explained that "an appeal from an order issued by a court exercising criminal jurisdiction is not constrained by CJP § 12–302(c) if the relief sought is collateral to the underlying criminal case against the defendant." *Id.* at 618 (quoting *In re Special Investigation No. 231,* 295 Md. 366, 370 (1983)). This Court, in *In re Special Investigation No. 231*, declared that in a grand jury proceeding, the State may appeal from an order that "settles the rights of the parties or concludes the cause." 295 Md. 366, 370. As explained *infra*, we conclude in this case that an investigation by a grand jury is not a "criminal case," and the grand jury subpoena duces tecum "bears none of the characteristics of a criminal case as that term is defined in the Courts and Judicial Proceedings Article." *Rice*, 447 Md. at 620. Consequently, the order adjudicating the County's motion for protective order is an appealable final judgment under CJP § 12–301 and is not limited by CJP § 12–302(c).

[4] Coercion in this context is determined by "whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer." *Garrity*, 385 U.S. at 496 (citations and quotations omitted). The firefighters in this case were allegedly presented with the same ultimatum—to "either forfeit their jobs or to incriminate themselves"—as the police officers in *Garrity*. *Id.* at 497. The Supreme Court in *Garrity* held that "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent" and, accordingly, constituted coercion within the ambit of the Fifth Amendment right against compelled self-incrimination. *Id.*

find for the County on the first two points, the proper disposition is to remand the case for an evidentiary hearing in the circuit court to determine whether the Department actually compelled the firefighters' statements—an issue the circuit court accepted based only on the County Attorney's proffer.

## I.

We first address the State's contention that the County does not have standing to assert a violation of the Fifth Amendment privilege against self-incrimination on behalf of its employees. The State admits that it did not raise the standing issue below, but asks this Court to consider it regardless of the fact that it was not preserved.

In response, the County attempts to pivot away from the idea that it is protecting the employees' individual Fifth Amendment rights, by asserting that it has standing based on the "right of a public employer to insist that its employees answer job-related questions." *Dep't of Pub. Safety & Corr. Servs. v. Shockley*, 142 Md. App. 312, 324 (2002). The County claims that the subpoena in question interferes with the County's—and more generally, the public's—legitimate interest in public employees complying with job-related questions. The County's diversion to its own right to require employees to answer job-related questions does not, however, remove the Fifth Amendment underpinning of its challenge to the subpoena and the requirements for standing to assert a Fifth Amendment claim on behalf of another. Nevertheless, we decline to address the standing issue because it was not preserved[5] and because it implicates a constitutional question that is not

---

[5] *See McGurk v. State*, 201 Md. App. 23, 33 (2011) (citing Maryland Rule 8-131(a)) (holding that "by failing to raise the standing [to assert a Fourth Amendment] issue in the

necessary to decide today.[6]  *Curran v. Price*, 334 Md. 149, 171 (1994) ("We have long adhered to the policy of not deciding constitutional issues unnecessarily.").

## II.

The State asserts that the grand jury is entitled to subpoena the Department's report

circuit court, the State waived the issue for appellate purposes" because an appellate court will ordinarily only decide *jurisdictional* questions unpreserved at trial).  The County here muddles arguments that pertain to jurisdictional standing requirements with the requirements for asserting the violation of a personal constitutional right.  *See Dorsey v. Bethel A.M.E. Church*, 375 Md. 59, 70 (2003) (citation omitted) (distinguishing issues described as "standing" from jurisdictional standing—"such as whether the 'case-or-controversy requirement' is met").  Addressing this same confusion in the federal context, the Supreme Court in *Rakas v. Illinois* attempted to extricate the standing doctrine nomenclature from the separate and distinct constitutional question of whether a party may successfully exclude evidence based on a claimed violation of a personal right.  439 U.S. 128, 138-40 (1978).  The *Rakas* Court concluded that the inquiry "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.* at 140.  The Court explained:

> Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

*Id.* at 138-39 (footnote omitted).  It is clear from *McGurk* and *Rakas* that the State's standing argument is non-jurisdictional and, therefore, we need not address it on appeal when it was not preserved below.

[6] There is robust jurisprudence holding that a private entity or its records custodian may not assert a Fifth Amendment claim on behalf of individual employees whose incriminating statements are contained within subpoenaed records.  *See, e.g.*, *Fisher v. United States*, 425 U.S. 391 (1976); *Couch v. United States*, 409 U.S. 322, 323-24 (1973). We recognize, however, that in those cases the element of government coercion was absent because the individuals had given their statements freely to private employers.  *See, e.g.*, *Couch*, 409 U.S. at 329 (finding an entity had no Fifth Amendment claim because "the ingredient of personal compulsion against an accused is lacking").

6

and witness statements because the Fifth Amendment only prohibits the grand jury from directly and actively violating the constitutional rights of the target(s) of its investigation—leaving the grand jury free to consider evidence that is already tainted at the time of production. According to the State, this is because the grand jury's historical role as an investigator, rather than an adjudicator, requires that courts afford the grand jury broad power to consider all available evidence regardless of that evidence's competency or admissibility at trial. The State adduces this argument from two progenies of Supreme Court decisional law: one holding that the Fourth Amendment's exclusionary rule is inapplicable to grand jury proceedings; and one holding that a court should not dismiss an indictment because the grand jury based its decision on tainted evidence, the admission of which at trial would violate the Fifth Amendment.

The County responds that the cases on which the State relies are inapposite. First, the County distinguishes those cases upholding an indictment based on tainted evidence on the ground that in each case, the court's decision was *ex post* rather than *ex ante* actively permitting a grand jury to bypass an individual's constitutionally protected rights. Second, the County argues that the State's reliance on the Fourth Amendment exclusionary rule—which weighs the harm of allowing in the evidence against the benefits of deterring similar future police misconduct—is inapplicable because there is no state misconduct involved in compelling work-related incident statements from public employees. The County urges that rule articulated in *Garrity v. New Jersey*—that public employees' compelled statements may not be used in any criminal proceedings—applies to the grand jury proceedings in this case. 385 U.S. 493. The County also directs us to a case from the

7

United States Court of Appeals for the Fourth Circuit, *In re Grand Jury, John Doe No. G.J. 2005-2*, 478 F.3d 581, 588 (4th Cir. 2007) ("*John Doe*"), in which that court affirmed a district court's decision to quash a subpoena after considering, in similar circumstances, the subpoena's Fifth Amendment implications.

Because the court's order involves the interpretation and application of constitutional and decisional law, we undertake a *de novo* review in determining whether the trial court's conclusions were legally correct. *In re Nick H.*, 224 Md. App. 668, 681 (2015).

## A. The Fifth Amendment Privilege

The Fifth Amendment to the United States Constitution, incorporated against the states by the Fourteenth Amendment,[7] provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." Similarly, Article 22 of the Maryland Declaration of Rights provides that "no man ought to be compelled to give evidence against himself in a criminal case."[8]

"It is important, in applying constitutional principles, to interpret them in light of the fundamental interests of personal liberty they were meant to serve." *Couch*, *supra*, 409

---

[7] *Malloy v. Hogan*, 378 U.S. 1, 6 (1964) ("Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.").

[8] Our judgment is based exclusively upon our interpretation of the protections afforded under the Fifth Amendment and the constitutional principles and case law derived therefrom. We note that no argument has been advanced that Article 22 of the Maryland Declaration of Rights should be given a different interpretation than would be accorded the Fifth Amendment in this context, nor do we perceive a different outcome in this case under Article 22.

U.S. at 336. The Fifth Amendment protects a claimant from "'the cruel trilemma of self-accusation, perjury or contempt[,]'" based, in part, on "'our fear that self-incriminating statements will be elicited by inhumane treatment and abuses.'" *Id.* at 328 (quoting *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55 (1964)). The privilege against self-incrimination does not, however, grant speakers a liberty interest in being free from inquiry. *Smith v. State*, 394 Md. 184, 212 (citations omitted). "For the history of the privilege establishes not only that it is not to be interpreted literally, but also that its sole concern is, as its name indicates, with the danger to a witness forced to give testimony leading to the infliction of penalties affixed to the criminal acts[.]" *Ullmann v. United States*, 350 U.S. 422, 438-39 (1956) (footnote, citation, and internal quotations marks omitted); *see also Kastigar v. United States*, 406 U.S. 441, 453 (1972) (explaining that the purpose of offering derivative use immunity to witnesses testifying before a grand jury is to ensure "that the testimony cannot lead to the infliction of criminal penalties on the witness"). Further, the Supreme Court has directed that "[t]he central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Marchetti v. United States*, 390 U.S. 39, 53 (1968).

In determining whether the State has violated an individual's privilege against self-incrimination, we are mindful of the scope of the constitutional right as well as the rules courts have created to help safeguard the right. Although the privilege against self-incrimination is fundamentally a "*trial right* of criminal defendants[,]" *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (emphasis added), the Supreme Court has

9

found it "necessary to allow assertion of the privilege prior to the commencement of a 'criminal case' to safeguard the core Fifth Amendment trial right." *Chavez v. Martinez*, 538 U.S. 760, 771 (2003); *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972) (reasoning that an individual may assert the privilege "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used"). Prophylactic rules and grants of immunity in non-criminal cases help further "preserve[] the core Fifth Amendment right from invasion by the use of that compelled testimony in a subsequent criminal case[,]" but "violations of judicially crafted prophylactic rules do not violate the constitutional rights of any person." *Chavez*, 538 U.S. at 771-72.

In sum, the claimant must face a substantial, non-speculative risk of criminal sanction resulting from the government's use of the coerced statement in a criminal proceeding. At the threshold of our analysis, then, we determine whether a grand jury investigation is a "criminal case" or "criminal proceeding" within the meaning of the Fifth Amendment.

### 1. No Criminal Proceeding

The County relies principally on *Garrity*, *supra*, in leveling its challenge to the grand jury subpoena's request for records containing statements by public employees that were coerced by the government. In *Garrity* the central issue was whether the State of New Jersey violated the Fifth Amendment rights of certain police officers by coercing statements from those officers during an internal affairs investigation and then using the

10

statements against the officers in subsequent prosecutions. 385 U.S. at 494-95. The Supreme Court held that the State had violated the officers' Fifth Amendment rights because the privilege against self-incrimination "prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office." *Id.* at 500. As this Court summarized the *Garrity* rule: "'The public employer has a choice between either demanding a statement from an employee on job-related matters, in which case it can not use the statements in a criminal prosecution, or prosecuting the employee, in which case it cannot terminate the employee for refusing to give a statement.'" *Shockley*, *supra*, 142 Md. App. at 322 (alteration omitted) (quoting *United States v. Camacho*, 793 F. Supp. 1504, 1514-15 (S.D. Fla. 1990)). Under *Garrity*, there is no constitutional injury when the government compels from its employees statements against the employees' self-interest unless and until the government uses those statements in a "criminal proceeding." *Id.* (citations omitted); *see also Chavez*, 538 U.S. at 769 ("Our holdings in these cases demonstrate that . . . mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled witness statements in a criminal case against the witness."). The question then becomes whether or not a grand jury investigation is a "criminal proceeding" within the meaning of *Garrity*. We begin by reviewing the grand jury's role and function in history.

**a. The Grand Jury's Historical Role as an Investigative Body**

Nearly a century ago, the Supreme Court observed that the grand jury "is a grand inquest, a body with powers of investigation *and inquisition*, the scope of whose inquiries is not limited narrowly by questions of propriety or forecasts of the probable result of the

11

investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Blair v. United States*, 250 U.S. 273, 282 (1919) (emphasis added). The Court of Appeals observed then that "[t]he institution known as the grand inquest, or the grand jury, is of ancient origin[,]" dating back at least to the rule of Henry III in the early Thirteenth Century. *In re Report of Grand Jury Appeal of Perring*, 152 Md. 616, 619 137 A. 370, 372 (1927) ("*Perring*").[9] The grand jury's "historic office has been to provide a shield against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only upon the considered judgment of a representative body of citizens acting under oath and under judicial instruction and guidance." *United States v. Mandujano*, 425 U.S. 564, 571 (1976). In this way the proceeding acts as a "buffer" between the government and the citizenry. *United States v. Williams*, 504 U.S. 36, 47 (1992).

Judge Digges, writing for the Court of Appeals in 1927 in *Perring*, expounded on the long revered efficacy of the grand jury:

> At common law, just as no man may be convicted and punished of a felony without the unanimous verdict of twelve of his peers, constituting the

---

[9] Some scholars have traced the origins of the grand jury back much further. *See* Renee B. Lettow, *Reviving Federal Grand Jury Presentments*, 103 Yale L.J. 1333, 1335 n.8 (1994) ("Established by Henry II's Assize of Clarendon in 1166, the grand jury's original function was to bring accusations before royal judges. At first all accusations originated with the grand jury, but later the jurors considered accusations from outsiders and passed upon indictments drawn up by crown prosecutors. The jurors, however, retained the power to accuse on their own initiative."); Michael F. Buchwald, *Of the People, By the People, For the People: The Role of Special Grand Juries in Investigating Wrongdoing by Public Officials*, 5 Geo. J. L. & Pub. Pol'y 79, 84 (2007) ("Like many traditions in our legal system, the grand jury came to America from Britain. The English grand jury is usually traced by historians back to the Assize of Clarendon issued by Henry II in 1166 to replace alternative decisionmaking methods such as trial by battle.").

12

petit jury, neither can he be put to his trial for any such offense except upon the presentment or indictment by at least twelve of his fellow citizens, constituting the grand jury. This is true in Maryland, in the federal courts, and in most of the states of the Union, . . . . So jealously have the people generally regarded this requirement as a safeguard to liberty that it is embodied in some form in most, if not all, of the Constitutions.

*Perring*, 152 Md. at 621, 137 A. at 372. In Maryland, that safeguard is found in Article 21 of Maryland's Declaration of Rights.[10]

To ensure that the grand jury may fully investigate potential wrongdoing, while protecting the public from crime and the accused from unfounded prosecutions, courts have traditionally accorded the grand jury "wide latitude to inquire into violations of criminal law." *United States v. Calandra*, 414 U.S. 338, 343 (1974). That is because "[a] grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *Id.* 343-44; *see also Bartram v. State*, 280 Md. 616, 627 (1977) (citations omitted) ("'The

---

[10] Among the six rights contained in Article 21 protecting those accused of crimes, the first is "[t]hat in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time to prepare for his defense[.]" Article 21 does not require that the grand jury convene and render an indictment in every case, for a defendant may waive the right to an indictment by a grand jury. Dan Friedman, The Maryland State Constitution 50 (Oxford University Press 2d ed. 2011) (citations omitted). However, where there is an indictment, then the defendant is entitled to a copy, and the indictment must "allege the essential elements of the offense charged and 'describe the particular offense with such reasonable certainty as to enable the accused to prepare his defense[.]'" *Id.* (citations omitted). Unlike the right against self-incrimination, the Fifth Amendment's grand jury clause is not incorporated against the states through the Fourteenth Amendment. *Hurtado v. California*, 110 U.S. 516, 534 (1884); *Gray v. State*, 368 Md. 529, 549-50 (2002).

grand jury is an accusing body, and not a judicial tribunal.'")

The grand jury's authority "to require the production of evidence" is "[i]ndispensable to the exercise of its power." *Mandujano*, 425 U.S. at 571 (citations omitted). As far back as 1891, the Court of Appeals emphasized the importance of this function, reasoning that without the power of inquest, the grand jury would be limited "to the investigation only of cases laid before them or falling under their own personal knowledge or observation." *Blaney v. State*, 74 Md. 153, 155, 21 A. 547, 547 (1891). The Supreme Court of the United States more recently reiterated that the sources of evidence into which the grand jury may inquire are "widely drawn, and the validity of an indictment is not affected by the character of the evidence considered." *Calandra*, 414 U.S. at 344-45. Its "investigative power must be broad if its public responsibility is adequately to be discharged." *Id.* at 344 (citations omitted). For this reason, the Court of Appeals has repeatedly described the grand jury's inquisitorial powers as "plenary." *See, e.g.*, *Lynkins v. State*, 288 Md. 71, 82 (1980); *Perring*, 152 Md. at 621, 137 A. at 327.

Commensurate with the grand jury's plenary inquisitional authority is the "obligation of every person to appear and give his evidence before the grand jury." *United States v. Dionisio*, 410 U.S. 1, 10 (1973). Like the grand jury itself, this duty stems from common law roots. The Supreme Court has remarked that it is unclear when grand juries began compelling witnesses to testify, but the power seems to have existed by 1612 when Lord Bacon declared: "'All subjects, without distinction of degrees, owe to the King tribute and service, not only of their deed and hand, but of their knowledge and discovery.'" *Blair*, 250 U.S. at 279-80 (citing *Countess of Shrewsbury's Case*, 2 How. St. Tr. 769, 778 (K.B.

14

1612)).  "The personal sacrifice" of those subpoenaed by the grand jury "is part of the necessary contribution of the individual to the welfare of the public."  *Id.* at 281.

### b.  Secrecy and Independence

Recognizing the sensitive and fluid nature of a preliminary investigation, the Court of Appeals has long mandated that grand jury proceedings remain secret.  *Elbin v. Wilson* 33 Md. 135, 144 (1870); *see also In re Criminal Investigation No. 437 in Circuit Court for Baltimore City*, 316 Md. 66, 76 (1989) ("Secrecy is the lifeblood of the grand jury.").  Secrecy protects the grand jury's freedom of inquiry as well as the privacy of the innocent persons who bear witness before it.  *Coblentz v. State*, 164 Md. 558, 566-67 (1933).  Maintaining secrecy is an "inflexible requirement," *id.* 566-67, which ensures the grand jury furthers public justice by remaining free from inducement and outside influence.  *Jones v. State*, 297 Md. 7, 23 (1983); *see also Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218-19 (1979) (footnotes and citations omitted) ("We have consistently recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.").  The secrecy rule, which, like the grand jury itself, is an antecedent of the common law that simultaneously protects: the investigation's integrity, the grand jurors themselves, hesitant witnesses who would "be less likely to testify fully and frankly," *Douglas Oil*, 441 U.S. at 219, as well as "individuals whose conduct may be investigated, but against whom no indictment may be found[.]"  *Coblentz*, 164 Md. at 567.

The grand jury does not sit within any of the branches of government, thereby providing an additional check on its integrity and the freedom of individuals who find themselves subject to an unfounded inquiry.  *Williams*, 504 U.S. at 47.  "In fact the whole

15

theory of its function is that it belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people." *Id.* (citations omitted). That does not mean, however, that the grand jury is entirely free from institutional review or that its subpoena power is unlimited. *Calandra*, 414 U.S. at 345-46. The grand jury has an "arm's length" relationship with the judiciary. *Williams*, 504 U.S. at 48. Although the grand jury "generally operates without the interference of a presiding judge[,]" a court need not lend its assistance to a grand jury's attempts to override a witness's testimonial privileges or constitutional rights. *Id.* "Even in this setting, however . . . the grand jury remain[s] 'free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witnesses called before it.'" *Id.* (quoting *Dionisio*, 410 U.S. at 17-18).

### c. No Criminal Proceeding until the Grand Jury Acts

As early as 1896, the Supreme Court determined that a grand jury is not a criminal proceeding. In *Post v. United States*, a criminal defendant asked the Supreme Court to demur his indictment based on a new, prospective state law that required the state to institute "criminal proceedings" in the judicial district in which the alleged offense occurred. 161 U.S. 583, 584-86 (1896). A federal district convened a grand jury before the new law took effect, but the grand jury did not indict the defendant until after that date. *Id.* The Court, therefore, had to determine whether a grand jury is a criminal proceeding. *Id.* at 586-87. It ruled:

> Criminal proceedings cannot be said to be brought or instituted until a formal charge is openly made against the accused, either by indictment presented or information filed in court, or, at the least, by complaint before a

16

magistrate. The submission of a bill of indictment by the attorney for the government to the grand jury, and the examination of witnesses before them, are both in secret, and *are no part of the criminal proceedings* against the accused, but are merely to assist the grand jury in determining whether such proceedings shall be commenced. The grand jury may ignore the bill, and decline to find any indictment; and it cannot be known whether any proceedings will be instituted against the accused until an indictment against him is presented in open court.

*Id.* at 587 (emphasis added) (internal citations omitted); *see also Virginia v. Paul*, 148 U.S. 107, 119 (1893) (ruling that there was no criminal proceeding before the state returned an indictment or initiated proceedings in the court). Similarly, the Court of Appeals has declared that a criminal case does not begin until the grand jury acts. *Reddick v. State*, 219 Md. 95, 100 (1959) (rejecting appellant's argument that the grand jury unreasonably delayed presenting appellant's indictment, the Court held that "[u]ntil the Grand Jury acted there was no case to be tried.").

In fact, the grand jury's entire function is determining "whether criminal proceedings *should be instituted* against any person." *Calandra*, 414 U.S. at 344 (emphasis added). Logically, to brand a grand jury investigation a criminal proceeding would diminish the fundamental precept of American criminal law that one is innocent until proven guilty. Indeed, "the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning[,]" *Blair* 250 U.S. at 282 (citing *Hendricks v. United States*, 223 U.S. 178, 184 (1912)), and a grand jury investigation may never actually result in a criminal proceeding. *Cf. Chavez, supra,* 538 U.S. at 766 (stating that it "need not decide today the precise moment when a 'criminal case' commences[,]" but reasoning that "[i]n our view,

17

a 'criminal case at the very least requires the initiation of legal proceedings"). The overwhelming number of courts to address this issue reached the same conclusion we do here: a grand jury is an investigative and inquisitorial proceeding, not a criminal proceeding.[11]

### d. A Body of Laypersons

Our conclusion that a grand jury is not a criminal proceeding is consistent with the grand jury's historical structure. We hesitate to create rules that would exclude evidence from a grand jury's consideration because, "in this Country as in England of old[,] the grand jury has convened as a body of laymen, free from technical rules[.]" *Costello v.*

---

[11] *See, e.g.*, *In re Grand Jury Subpoena*, 138 F.3d 442, 444 n.2 (1st Cir. 1998) (motion to quash grand jury subpoena of attorney's depositions and exhibits investigating alleged police misconduct "does not implicate any Fifth Amendment issues"); *In re Taylor*, 567 F.2d 1183, 1186 (2d Cir. 1977) ("grand jury investigations are not criminal proceedings"); *In re Special Sept. 1978 Grand Jury (II)*, 640 F.2d 49, 64 (7th Cir. 1980) ("It is not disputed that these documents were subpoenaed for the continuing Grand Jury investigation and not for the criminal proceedings resulting from the indictments already returned"); *Nixon v. Sirica*, 487 F.2d 700, 749 (D.C. Cir. 1973) (a grand jury proceeding is "not a criminal trial of an accused"); *In re Lemon*, 59 P.2d 213, 214 (Cal. Dist. Ct. App. 1936) ("a grand jury investigation is in no proper sense a criminal proceeding"); *In re Feb. 1970 Cook Cnty. Special Grand Jury*, 263 N.E.2d 832, 833 (Ill. 1970) (a criminal proceeding does not commence until the grand jury returns an indictment); *Fletcher v. Graham*, 192 S.W.3d 350, 402 (Ky. 2006) ("the grand jury does not conduct criminal proceedings; it initiates criminal proceedings by the return of an indictment"); *Ims v. Town of Portsmouth*, 32 A.3d 914, 923 (R.I. 2011) (a grand jury proceeding is an inquiry, not a criminal trial). *See also In re Grand Jury Subpoenas (Albuquerque Police Dep't),* 40 F.3d 1096, 1104 (10th Cir. 1994) (the Fifth Amendment does not protect a police officer from the disclosure of internal affairs statements, administratively compelled, to a grand jury); *but compare In re Grand Jury Proceedings*, 45 F.3d 343, 347-48 (9th Cir. 1995) ("[T]he district court's statement that 'a grand jury proceeding is not a criminal proceeding,' is [] incorrect."), *with In re Grand Jury Subpoena*, 75 F.3d 446, 448 (9th Cir. 1996) (finding that the Fifth Amendment does not protect the production of an officer's statements to internal affairs, but instead "guards against any improper use of them").

*United States*, 350 U.S. 359, 362 (1956). As laypersons, the grand jurors, "do not know and cannot be expected to know, the technical rules of evidence; and while, no doubt, it is the duty of the prosecutor to give them such as he may in that respect, he has no control over them." *Bartram*, *supra*, 280 Md. at 625. To permit the subject of a grand jury's investigation to challenge the competency of evidence the grand jury considers

> would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial.

*Costello*, 350 U.S. at 364. Accordingly, affirming the lower courts' refusal to dismiss an indictment on the ground that the only evidence before the grand jury was hearsay, the Supreme Court in *Costello* instructed that "neither the Fifth Amendment nor any other constitutional provision prescribes the kinds of evidence upon which grand juries must act." *Costello*, 350 U.S. at 362; *cf. In re: Special Investigation No. 228*, 54 Md. App. 149, 183 (1983) (citing *Calandra*, 414 U.S. at 351-52) ("Even to vindicate the loftiest constitutional ideals, we do not suppress evidence at the grand jury level.").

That does not mean, however, that a person brought before a grand jury is without Fifth Amendment protection. For example, the Supreme Court has established that a witness may not ignore a grand jury subpoena, *Mandujano*, 425 U.S. at 573 ("Under settled principles, the Fifth Amendment does not confer an absolute right to decline to respond in a grand jury inquiry."), but after doing so is free to assert the privilege against self-incrimination unless the government offers the witness derivative use immunity, *see*

19

*Kastigar*, *supra*, 406 U.S. at 462. The Court of Appeals has suggested that the distinction lies somewhere between a grand jury's consideration of incompetent evidence and a grand jury forcing an individual to bear witness before the grand jury "browbeaten and maltreated." *Bartram*, *supra*, 280 Md. at 625-26. We believe the Supreme Court's analysis in *Calandra* offers a useful analogy.

## 2. A Grand Jury May Not Actively Coerce Testimony

The State argues that, under *Calandra*, a grand jury is free to consider tainted evidence so long as it does not taint the evidence itself. The County responds that *Calandra*—a case that dealt with the Fourth Amendment's applicability to grand juries— is inapplicable because the Fourth Amendment's exclusionary rule involves a different calculus than the Fifth Amendment's privilege. While the County's distinction is correct, the County misses *Calandra*'s broader, central teaching.

In *United States v. Calandra*, a federal grand jury, which was convened to investigate loansharking, subpoenaed a witness to testify based on receipts tending to indicate the witness was a loanshark. 414 U.S. at 340-41. The witness sought and was granted leave to move the federal district court to suppress use of the receipts as evidence on the grounds that the police seized them from his home while executing an unrelated search warrant, the scope of which did not include the receipts. *Id.* The district court granted his motion, finding that the search warrant was not founded on probable cause and the police exceeded the warrant's scope. *Id.* at 342. In affirming the district court, the Sixth Circuit ruled that the Fourth Amendment "exclusionary rule may be invoked by a witness before the grand jury to bar questioning based on evidence obtained in an unlawful

search and seizure." *Id.*

The Supreme Court granted certiorari to consider whether the Sixth Circuit erred in applying the Fourth Amendment exclusionary rule to a grand jury proceeding. *Id.* at 339, 346. After setting out the grand jury's historical role and function, the Court ruled that a grand jury "may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law." *Id.* at 346. The Court used the Fifth Amendment to illustrate this distinction: "Although, for example, an indictment based on evidence obtained in violation of a defendant's Fifth Amendment privilege is nevertheless valid, the grand jury may not force a witness to answer questions in violation of that constitutional guarantee." *Id.* (citations omitted). The Court concluded that the judiciary should only intervene if the grand jury subpoena "is far too sweeping in its terms to be regarded as reasonable under the Fourth Amendment." *Id.* (citation and quotations omitted).

Although the *Calandra* Court also stated that "a grand jury may not compel a person to produce books and papers that would incriminate him[,]" *Calandra*, 414 U.S. at 346, the Court has since narrowed the scope of this pronouncement. In a series of cases beginning with *Couch v. United States*, followed by *Fisher v. United States*, the Supreme Court explained that the Fifth Amendment is implicated only when the actual act of producing the books or papers would incriminate the subpoenaed individual. *Couch*, 425 U.S. 322, 329 (1976); *Fisher*, 425 U.S. 391, 410-14 (1976). In other words, the Fifth Amendment is implicated only where the act of producing the record is testimonial, or where the grand jury forced the speaker to "restate, repeat, or affirm the truth of [the records'] contents."

21

*United States v. Doe*, 465 U.S. 605, 612 (1984). The Court of Appeals recognized that "[a]fter *Fisher*, the focus of the Fifth Amendment privilege with respect to records and documents became not the actual documents, but instead the act of producing the documents." *Unnamed Att'y v. Att'y Grievance Comm'n of Maryland*, 349 Md. 391, 405 (1998); *see also Curran v. Price*, 334 Md. 149, 175 (1994) ("[I]t is only the testimonial nature of the act of production for which the privilege may be asserted.").

In *Steffey v. State*, this Court analyzed *Calandra* and applied its rule to a grand jury's consideration of allegedly coerced statements contained within a police department's internal affairs report. 82 Md. App. 647, 649, 651-52, 657-58 (1990). Although the posture of the case was an already-indicted defendant's motion to suppress, rather than the motion to quash a subpoena at issue here, our analysis in *Steffey* is still germane. There, we interpreted *Calandra* as standing for the proposition that courts should not dismiss indictments based on "the evidence *presented* to grand juries and thus *used* during grand jury proceedings. Rather, *Calandra* simply pointed out which actions by the grand juries themselves would not be tolerated." *Id.* at 658 (emphasis in original). Applying this distinction to the grand jury's subpoena of internal affairs documents containing previously-coerced statements, we did not find a violation of the claimant's constitutional rights and held that the defendant was not entitled to relief. *Id.* at 658-59.

These cases make clear that "[i]t is extortion of information from the accused himself that offends our sense of justice," and a claimant cannot sustain a Fifth Amendment claim based on a grand jury subpoena if "the ingredient of personal compulsion against an accused is lacking." *Couch*, 409 U.S. 328-29. Here, the grand jury is not compelling the

County to speak; nor is it compelling the County to restate or affirm the truth of the investigation report's contents.  *See Doe*, 465 U.S. at 612.  Instead, the grand jury is merely requesting that the County produce documents that the County freely admits are in its possession.  Consequently, the County's act of producing those documents would be non-testimonial and, therefore, would not implicate the Fifth Amendment privilege.

### 3.  Protecting Grand Jury Proceedings

We have established that the grand jury acts independently of the judiciary, and the County offers no grounds that justify the circuit court's intervention in this case.  *See Williams*, *supra*, 504 U.S. at 47.  In *Calandra*, the Supreme Court cautioned that "[p]ermitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudications of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings."  414 U.S. at 349.  *Calandra*'s concern is consistent with the rationale behind the Supreme Court's oft-repeated rule that a defendant may not challenge an indictment solely on the ground that the grand jury considered incompetent evidence.  *See, e.g.*, *Lawn v. United States*, 355 U.S. 339, 348-50 (1958); *Costello*, *supra*, 350 U.S. at 359, 363; *Holt v. United States*, 218 U.S. 245, 247-48 (1910).  The Court of Appeals similarly warned that:

> [I]f, on a motion to quash, the competency of the evidence presented could be inquired into, the trial courts would be obliged to sit as courts of review, to examine into the correctness of every ruling made upon the evidence by the grand jurors.  The obstructions to justice and the unnecessary and uncalled-for waste of time, and consequent expense to the state as well as to defendants, which will result from such a course, are too obvious to need comment.

*Bartram*, *supra*, 280 Md. at 624-25 (citation omitted).

23

Allowing a claimant to challenge the evidence considered by the grand jury would permit abuses of criminal practice and "saddle a grand jury with minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *Dionisio*, *supra*, 410 U.S. at 17; *see also Costello*, 350 U.S. at 363 ("The result of such a rule [permitting indictments to be challenged on the competency of evidence] would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury."); *cf. In re Special Investigation No. 227*, 55 Md. App. 650, 654 (refusing to even consider the merits of petitioner's claim, because "the Fourth Amendment merits and the exclusionary rule ha[ve] no place at the grand jury stage of investigation[.]"); *Bartram v. State*, 33 Md. App. 115, 183 (1976), *aff'd*, 280 Md. 616 (1977) ("The acid test of [the grand jury's] actions, however, will come when the petit jury renders its verdict upon the charges they have brought.").

In *United States v. Blue*, the Supreme Court considered whether or not the district court should have dismissed an indictment based on tainted evidence. 384 U.S. 251, 254-55 (1966). Blue filed a pretrial motion to dismiss his indictment because it was based on incriminating statements that he made in petitions contesting certain jeopardy assessments against him by the Internal Revenue Service. *Id.* at 252. Ultimately, the Court decided that the proper outcome was not to dismiss the indictment but to allow the defendant to "pursue his Fifth Amendment claim through motions to suppress and objections to evidence." *Id.* at 256. The Court reasoned:

> Even if we assume that the Government did acquire incriminating

24

evidence in violation of the Fifth Amendment, [the defendant] would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. . . . Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by the exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.

*Id.* at 255 (footnote omitted); *see also Clark v. State*, 140 Md. App. 540, 560 (2001) (citing *State v. Bailey*, 289 Md. 143, 1490-50 (1980) ("Maryland's appellate courts have been 'steadfast' in holding that a motion to dismiss [an indictment] is not a proper vehicle for testing the admissibility of testimonial evidence at trial and that a defendant is not entitled to dismissal because the prosecution presented tainted evidence to the grand jury.").

In keeping with the foregoing decisional law, we determine that to protect the public's interest in a grand jury with plenary inquisitorial powers without compromising an individual's right to keep criminal proceedings free from coerced, self-incriminating statements and the fruits thereof, the grand jury should be permitted to move forward with its inquiry and if necessary, the target(s) of the investigation may challenge the admissibility of the coerced statements through a motion to suppress prior to trial. Again, the Fifth Amendment is in place to ensure "that [coerced] testimony cannot lead to the infliction of criminal penalties on the witness[,]" *Kastigar*, *supra*, 406 U.S. at 435, and the claimant may not assert the privilege until "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination[,]" *Marchetti*, *supra*, 390 U.S. at 53. The Fifth Amendment analysis focuses on the *use* of statements.

Here, the firefighters may move to suppress their statements prior to trial. We do

not believe that a rule permitting a court to intervene and prevent a grand jury from considering such evidence would, in any significant way, further the interests that the Fifth Amendment privilege is meant to protect.[12]  In conclusion, we hold that the circuit court erred by granting the County's motion to suppress the firefighters' statements and the investigation report.  Accordingly, we need not reach the State's third contention.

For these reasons, we entered the November 23, 2016 *per curiam* order reversing that part of the circuit court's order granting Prince George's County's motion for protective order as to the compelled statements of the respondent firefighters and the report proposed by the Fire Department's investigation.

---

[12] The County also argues that, although not binding on this Court, the Fourth Circuit in *In re John*, *supra*, 478 F.3d 581 (2007), "refused to overrule a federal District Court that granted a city's motion to quash a grand jury subpoena for internal affairs statements that related to the same incident for which an officer was being investigated by the government for civil rights violations."  While the County does state correctly the disposition in that case, it disregards the fact that the district court based its decision not on the Fifth Amendment, but on Federal Rule of Civil Procedure 17(c), which "enables district courts to quash a subpoena that intrudes gravely on significant interests *outside* of the scope of a recognized privilege[.]"  *John Doe*, 478 F.3d at 585 (emphasis added) (citation omitted); *see also In re Grand Jury Matters*, 751 F.2d 13, 17-18 (1st Cir. 1985) ("A judge may quash grand jury subpoenas in the proper exercise of his rule 17(c) supervisory powers even though the subpoenaed materials are not covered by a statutory, constitutional, or common law privilege." (citations omitted)).  Additionally, the Fourth Circuit in *John Doe* only reviewed the district court's application of Rule 17(c) for abuse of discretion and did not itself analyze the Fifth Amendment implications.  478 F.3d at 585.  In short, the Fourth Circuit's decision does not persuade us against our decision here.

26